535 So.2d 833 (1988)
Mary Ann MUSTACCHIO, et ux, Plaintiffs-Appellants,
v.
Dr. John D. PARKER, et al, Defendant-Appellee.
No. 19828-CA.
Court of Appeal of Louisiana, Second Circuit.
August 17, 1988.
*834 Stephen E. Everett, Alexandria, for plaintiffs-appellants.
Hayes, Harkey, Smith, Cascio & Mullens by Haynes L. Harkey, Jr., Monroe, for defendant-appellee.
Before JASPER E. JONES, FRED W. JONES, Jr. and SEXTON, JJ.
SEXTON, Judge.
The plaintiffs, Mary Ann Mustacchio and her husband, James V. Mustacchio, appeal the trial court judgment denying their claim for damages for medical malpractice allegedly committed by the defendant, Dr. John D. Parker. We affirm.

FACTS
In the latter part of 1980, while she was living in Tulsa, Oklahoma, Mrs. Mustacchio decided to have her overbite corrected. She consulted an orthodontist, an oral surgeon, and a general dentist before she selected Dr. Don R. McArthur as her orthodontist.[1]
Mrs. Mustacchio was under Dr. McArthur's care for the next one and a half to two years. During this time, she also saw two dentists for her checkups and cleanings. She told all three of these dentists that her teeth were loose and that she was concerned about this looseness. None of these dentists took any x-rays.
In 1983, Mrs. Mustacchio moved to Monroe, Louisiana, when her husband's employer transferred him there. Before she left Oklahoma, she consulted another orthodontist about the looseness in her teeth. Like the other dentists, he did not take any x-rays. He did give her a list of orthodontists in Monroe. She selected Dr. Parker from that list.
She first saw Dr. Parker on April 21, 1983. On this first visit to Dr. Parker, she told him about the looseness of her teeth and continued to complain about the looseness throughout her treatment by him. Believing that the braces on her teeth were too heavy, Dr. Parker changed to lighter braces.
Dr. Parker took the braces off on January 16, 1984 and took measurements for retainers. Although her teeth were still loose at this time, Dr. Parker attributed the mobility to the orthodontic treatment. Apparently, some mobility is not unusual after braces are removed. He expected the teeth to tighten up in three to four weeks. In February, 1984, the mobility persisted and Dr. Parker referred her to Dr. Damon Bradford, a periodontist, because he thought a gum problem might exist. Mrs. Mustacchio saw Dr. Bradford in April of 1984. Dr. Bradford x-rayed her teeth and discovered that she had experienced significant root resorption.
Resorption is the loss of the root structure of the teeth. The most dramatic resorption has occurred on the four upper incisors. There was minimal resorption on three lower incisors and moderate resorption on a fourth lower incisor. There was also limited resorption on other teeth.
None of the dentists that she saw during her orthodontic treatment, including Dr. McArthur and Dr. Parker, told her of the particular risk of resorption.
In July of 1984, Mrs. Mustacchio began seeing Dr. Conrad L. Cloetta, a prosthodontist[2] in Dallas, Texas. He splinted her four front teeth and filed down her teeth in the back to give her a better bite. She is still under his care and that of a periodontist in Georgia, her current home.
Mr. and Mrs. Mustacchio alleged that Dr. Parker was negligent in failing to discover the root resorption problem by failing to employ x-rays and that Dr. Parker was *835 negligent in failing to inform Mrs. Mustacchio of the risk of root resorption.
The trial court found that the defendant had not obtained the plaintiff's written informed consent as required by LSA-R.S. 40:1299.40. The court stated that this failure alone did not make the defendant liable to the plaintiff. Citing LaCaze v. Collier, 434 So.2d 1039 (La.1983), the trial court held that the plaintiff failed to prove that the failure to inform caused the damaging consequences. The court noted that the plaintiff was two-thirds of the way through the treatment when she started seeing the defendant, and that the expert testimony was to the effect that even if the resorption had been discovered at that point, continued orthodontic treatment was necessary. The court found that the plaintiff would have been unreasonable to have decided to avoid treatment through fear of improbable and unlikely consequences. Further, the court found that plaintiff failed to prove that her injuries were the result of a lack of knowledge and skill on the part of Dr. Parker and thus the court rejected the plaintiff's demands.

INFORMED CONSENT
On appeal, the plaintiffs initially argue that the trial court did not properly apply the law on informed consent as provided in LSA-R.S. 40:1299.40 when it found that Dr. Parker was not negligent in his failure to inform Mrs. Mustacchio of the risk of resorption. When a patient consents to treatment but does not have sufficient information to make an informed decision concerning his treatment, the doctor may be liable in negligence for a poor result. LaCaze v. Collier, supra, at 1040-41, n. 1; Hodge v. Lafayette General Hospital, 399 So.2d 744 (La.App. 3rd Cir.1981); Percle v. St. Paul Fire & Marine Insurance Company, 349 So.2d 1289 (La.App. 1st Cir.1977), writ denied, 350 So.2d 1218 (La.1977).
LSA-R.S. 40:1299.40 provides that consent to a medical procedure consists of explaining to the patient the nature and purpose of the procedure and the known risks "of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures." According to subsection C of the statute, consent does not have to be written if the preceding information is conveyed to the patient and the patient is given an opportunity to ask questions which are satisfactorily answered. The Supreme Court has held that under this statute "the physician's requirement is to disclose all known risks of the listed consequences occurring, whether or not the probability of the occurrence is remote." LaCaze v. Collier, supra, at 1046.
There is no question that Mrs. Mustacchio experienced root resorption on several of her teeth. It is clear from the expert testimony that resorption is a known risk of orthodontic treatment. Various studies reveal that resorption occurs in anywhere from 21% to 100% of the orthodontic cases. Dr. Parker testified that he was aware that root resorption was a risk of orthodontic treatment. Dr. Parker admitted that he did not inform Mrs. Mustacchio of the risk of root resorption.
Proving that the undisclosed risk occurred is not sufficient for the plaintiff to recover. The plaintiff must also prove that the failure to inform of this risk caused the damaging consequences. LaCaze, supra. In other words, the plaintiff must prove that if the risk had been disclosed, the treatment and the unwanted consequences would have been avoided. If the patient would have undergone the treatment anyway, then the failure to inform did not cause the unwanted consequences and the plaintiff cannot recover.
The courts have adopted an objective test for determining causation. Under this test, the court examines "whether a reasonable person in the patient's position would have consented to the operation if full disclosure had been made." LaCaze, supra, at 1048 (emphasis in original). Among the things to be considered in determining causation are the condition of the patient at the time of the decision, the necessity for the treatment, the seriousness of the undisclosed consequence, the *836 likelihood of the consequence occurring, and the measures available for the correction of the consequence if it should occur.
We initially observe that the instant case is perhaps not governed by LaCaze, supra. First of all, LaCaze dealt with an interpretation of LSA-R.S. 40:1299.40. The risk or consequence involved in the instant case is clearly not among those listed in the statute.[3] Just as importantly, the record is clear that this plaintiff was two-thirds of the way through her procedure when she contacted Dr. Parker. We have been unable to locate any jurisprudence or legal scholarship speaking to the duty of a physician who takes over an ongoing procedure. We question whether his duty to warn is the same as that of the physician initiating the procedure. For example, it seems apparent that if a surgeon becomes disabled in the middle of an operation and a substitute surgeon is required to conclude the procedure, the substitute surgeon would have no duty to warn. Obviously, there are significant differences between the example given and the instant situation. However, the example does dramatically illustrate the question.
However, it is unnecessary that we resolve the foregoing questions as we determine that the trial court was not clearly wrong in finding that a reasonable person in Mrs. Mustacchio's position would have agreed to continue the treatment even if the problem had been noted on her initial visit to Dr. Parker and she had been warned thereof.
The consequences of the root resorption are potentially serious as once the root has been resorbed, it will not grow back. As we previously pointed out, there is a body of opinion that root resorption occurs to some degree in almost every orthodontic procedure. In the instant case it must be conceded that there is a probability the plaintiff will lose her top four middle teeth but retain the bottom four. She has a splint on her teeth which does not cure the mobility but does prevent the teeth from moving.
The likelihood of such serious consequences was quite small. According to the medical testimony, the severe resorption that Mrs. Mustacchio experienced occurs in less than one percent of all orthodontic cases. In practice for about twelve and one-half years, Dr. Parker had never seen resorption this severe. Dr. H.O. Blackwood, III, a Shreveport orthodontist, testified that in 27 years of practice he had seen only three cases of resorption as severe as Mrs. Mustacchio's. Dr. Cloetta, in practice since 1974, stated that he had never had a patient with a case of resorption as severe as Mrs. Mustacchio's. Only as an instructor at the Baylor College of Dentistry had he seen a few cases similar to hers in severity.
Dr. Parker testified that when Mrs. Mustacchio first came to see him she still had some spacing and nonparallel roots. Even if he had discovered the root resorption at this point, he would have wanted to continue the orthodontic treatment because it would have been medically unwise to leave her teeth in that condition. Dr. Cloetta and Dr. Blackwood agreed. Dr. Cloetta stated that once the problem is discovered, the orthodontist does not automatically take all of the braces out. He cannot stop treatment in midstream.
The teeth have to be left in a functional position. If the teeth are left in a nonfunctional position, they will eventually be lost anyway. By continuing the treatment and placing the teeth in a functional position, despite the extent of resorption, the orthodontist increases the chance that the teeth will not be lost. It was his opinion that Mrs. Mustacchio was better off having completed the orthodontic treatment rather than concluding the treatment at the time she came to Dr. Parker if the problem had been found then. Most importantly, if she does lose her teeth, her teeth are in a good position for bridgework.

*837 STANDARD OF CARE
The plaintiffs secondarily assert that the failure of the defendant to take periodic x-rays to diagnose root resorption falls below the appropriate standard of care and constitutes negligence. In support of their argument, they cite Favalora v. Aetna Casualty & Surety Company, 144 So.2d 544 (La.App. 1st Cir.1962). The court in Favalora held that adherence to a standard of care practiced by others in the profession is not a defense in a malpractice action if the standard constitutes negligence because it fails to meet the test of reasonable care and diligence required of the medical profession.
Two types of x-rays were discussed in the testimony. Bite wing x-rays can be safely taken every six months. These x-rays show just the crowns of the teeth and are taken for the purpose of locating cavities. They do not show the roots of the teeth and thus do not reveal root resorption. Full mouth x-rays, however, show the roots of the teeth and enable the orthodontist to detect root resorption.
Dr. Parker testified that it was his policy to take a set of full mouth x-rays at the beginning of the orthodontic treatment and then about three months after the braces are removed. He retakes x-rays during treatment only if he suspects a problem. He stated that a set of full mouth x-rays should not be taken every six months because of the danger of radiation. He advocates taking them no more often than once every two years.
The other two dentists that testified generally agreed with Dr. Parker. Dr. Blackwood testified that it is not the practice in the profession to take x-rays just to look for resorption because of the danger of exposing the patient to excess radiation. He also testified that the decision to take full mouth x-rays is based on the clinical judgment of the treating orthodontist.
Dr. Cloetta, plaintiff's prosthodontist, formed his opinion about the taking of x-rays from his discussions with orthodontists in the Dallas area. Dr. Cloetta admitted that it was difficult for him to determine what the standard of care is in the orthodontic community. He did state that routine x-rays should be taken during the course of treatment to monitor a patient's general dental health. He agreed routine x-rays can be taken every six months without presenting a risk of harm. While he did state that he would use the x-rays to check for root resorption, he emphasized that the routine x-rays are taken generally for the purpose of discovering tooth decay. Resorption is just one of the things that he looks for. He admitted that a mere complaint by the patient that her teeth were loose is not an indication to the orthodontist that x-rays should be taken. He also stated that orthodontists generally do not like to take routine x-rays but prefer to have the patient's general dentist take the routine x-rays.
The medical testimony reveals that resorption is a common occurrence during orthodontic treatment. We thus find that it is a risk of which orthodontists should be aware. We find, however, that under the circumstances of this case the act of the defendant of not taking full mouth x-rays solely for the purpose of looking for root resorption was not negligence. The evidence reveals that in the vast majority of cases the resorption is mild and does not cause a clinical problem. The extent of resorption experienced by Mrs. Mustacchio was rare, occurring in less than one percent of the cases. The danger from radiation outweighs the benefits since resorption is a problem in less than one percent of the cases. Also, we cannot say that the trial judge was clearly wrong in his implicit determination that plaintiff's symptoms, when compared to the risk of resorption, did not warrant x-rays.
Most importantly, even if x-rays had been taken and resorption was discovered, it seems clear that the orthondontic procedure should have been continued due to the stage of that treatment.
Plaintiffs' final assignment of error is that the trial court was clearly wrong in its factual conclusions. We have detailed the factual circumstances in our discussion of the first two assignments of error and will not repeat them here. Suffice it to say *838 that the evidence is sufficient to support the trial court's conclusion.
For the foregoing reasons, we affirm the judgment of the trial court rejecting the demands of plaintiffs.
AFFIRMED.
NOTES
[1] Dr. McArthur did not testify at trial. He is the defendant in an Oklahoma suit arising out of the same circumstances as the present case.
[2] Prosthodontics is a specialty that involves the replacement of missing teeth and the reconstruction of occlusions (the manner in which the upper and lower teeth come together). Prosthodontists do handle resorption problems.
[3] The statute provides that the known risks of which a doctor must inform his patient are death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, and disfiguring scars. The degree of resorption that is a known risk does not result in any of these consequences.