593 So.2d 427 (1991)
Joel W. BOYD, et al.,
v.
LOUISIANA MEDICAL MUTUAL INSURANCE COMPANY, et al.
No. 90 CA 0896.
Court of Appeal of Louisiana, First Circuit.
December 27, 1991.
Robert L. Kleinpeter, Baton Rouge, for plaintiffs-appellees Joel W. Boyd, et al.
Herbert J. Mang, Jr., Metairie, for defendant-appellant I, Louisiana Medical Mut. Ins. Co., Dr. Michael J. Coogan, M.D.
*428 S. Alfred Adams, Baton Rouge, for defendant-appellant 2, Douglas D. Green, Com'r of Ins. for the State of La.
Before SHORTESS, LANIER, and CRAIN, JJ.
SHORTESS, Judge.
Doctor Michael J. Coogan, his insurer, Louisiana Medical Mutual Insurance Company, and the Louisiana Patient's Compensation Fund (defendant) appeal from a judgment in favor of Joel W. Boyd, individually and on behalf of the minor child, Jamie Leigh Boyd (plaintiff).[1] After a trial on the merits, the jury found defendant failed to adequately inform plaintiff of the risk associated with an oral polio vaccine dispensed to Jamie Leigh and this failure caused plaintiff to contract the disease.
Jamie Leigh was approximately two months old when Dr. Coogan administered a drug known as Orimune, a brand of live oral polio vaccine (also known as Sabin vaccine), to her on March 20, 1984. Plaintiff contracted polio from the vaccine and now suffers from permanent paralysis in the right leg and hip. Dr. Coogan did not inform Mrs. Boyd of the risk associated with the vaccine,[2] which includes paralysis and death, and Dr. Coogan did not inform the Boyds of the availability of an injectable vaccine (Salk vaccine) which does not have the same risk associated with it but which is not as effective in the prevention of polio.[3]
Defendant presents two related issues for review. Is the remote risk (one in 8,000,000 doses) associated with the use of the oral polio vaccine a material risk? And, if so, would a reasonable patient adequately informed of the risk and alternatives choose to take the oral vaccine?
Our informed consent law is found in LSA-R.S. 40:1299.40. In 1984, the statute provided:
A. Notwithstanding any other law to the contrary, written consent to medical treatment means a consent in writing to any medical or surgical procedure or course of procedures which (a) sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures, (b) acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner, and (c) is signed by the patient for whom the procedure is to be *429 performed, or if the patient for any reason lacks legal capacity to consent by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.
B. Except as provided in Subsection A of this Section, no evidence shall be admissible to modify or limit the authorization for performance of the procedure or procedures set forth in such written consent.
C. Where consent to medical treatment from a patient, or from a person authorized by law to consent to medical treatment for such patient, is secured other than in accordance with Subsection A above, the explanation to the patient or to the person consenting for such patient shall include the matters set forth in Paragraph (a) of Subsection A above, and an opportunity shall be afforded for asking questions concerning the procedures to be performed which shall be answered in a satisfactory manner. Such consent shall be valid and effective and is subject to proof according to the rules of evidence in ordinary cases.
The principle that every human being of adult years and sound mind has a right to determine what shall be done to his or her own body is the bedrock that supports the doctrine. Hondroulis v. Schuhmacher, 553 So.2d 398, 411 (La.1988). The patient's right to decide whether to obtain or to refuse medical treatment is a fundamental right protected by Article I, Section 5 of the 1974 Louisiana Constitution. A decision of this sort is "intrinsically personal" and may mean the difference between "life and death, pain and pleasure, poverty and economic stability." Id. at 415.
Physicians are required to provide patients with information sufficient to permit the patient to make an informed and intelligent decision on whether to submit to a proposed course of treatment. However, a physician's duty to disclose information extends only to risks that are material. Id. at 411. A risk is material when a reasonable person, in what the physician knows or should know to be the patient's position, would be likely to attach significance to the risk or cluster of risks in deciding whether to forego the proposed therapy. Canterbury v. Spence, 464 F.2d 772, 787 (D.C.Cir. 1972).
A causal relationship must also exist between the failure to disclose material information and damage to the patient. The courts of this state have adopted an objective test for determining causation. The test is whether a reasonable person in the patient's position would have consented to the operation if the physician had fully disclosed all material risks. LaCaze v. Collier, 434 So.2d 1039, 1048 (La.1983).

A.
In 1984, several major organizations recommended (or required) that physicians inform parents of the risk associated with the Sabin vaccine. Dr. Roberta Vicari, who performed her pediatric residency at the Earl K. Long Memorial Hospital (EKL) between 1982 and 1985, testified that as a public institution, EKL was required by federal regulations to use Center for Disease Control approved "informed consent" forms.[4] The 1984 version of the Physicians Desk Reference (PDR) recommended that attending physicians convey adequate warning to parents of the possibility of vaccine-associated paralysis.[5] Similarly, *430 the 1982 Report of the Committee on Infectious Diseases of the American Academy of Pediatrics recommended that physicians educate parents regarding the benefits and risks of all vaccines.
Dr. Margaret Stock, who was accepted by the court as an expert in pediatrics and clinical immunology, testified on behalf of plaintiff. According to Stock, patients should be informed of significant risks, such as paralysis and death, even though the statistical chances are slight. Even defendants' experts agreed that it is important for parents to have enough information so that a considered decision can be made. Moreover, since approximately 1985, all of the pediatricians who testified are informing parents of the chance of vaccine-related paralysis from the Sabin vaccine.
As noted above, the doctrine of consent to medical treatment is rooted in the idea that a person has a right to make major decisions regarding his or her own body. The doctrine encompasses the concepts of self-determination and bodily integrity and deservedly receives special consideration from our society.
After examining the record, we cannot conclude the jury was clearly wrong in finding Dr. Coogan breached his duty to inform the Boyds of the risk associated with the vaccine. When the risk associated with polio vaccines includes, as in this case, severe paralysis and/or death, the risk may be material even though the possibility of it occurring is very small. Any other ruling would undermine all patients' rights of self-determination and bodily integrity. Encouraging patient participation will also provide information that will help them monitor their well-being by enabling patients to recognize adverse side effects from the drug treatment and to quickly seek medical attention.
Since we find that defendant had a duty to inform plaintiff of the risk associated with the Sabin vaccine and that he breached this duty, we must therefore examine whether there is a causal relationship between defendant's failure to disclose the information and the damage to plaintiff.

B.
As stated earlier, the courts of this state adopted an objective standard of causation, i.e., whether a reasonable patient in the plaintiff's position would have consented to the treatment had the physician disclosed the risk. Hondroulis, 553 So.2d at 470. A jury's determination of causation is one of fact and cannot be modified on appeal unless manifestly erroneous. See LaCaze, 434 So.2d at 1048; also Mustacchio v. Parker, 535 So.2d 833 (La.App.2d Cir. 1988).
Drs. Ben Thompson, Ronaldo Funes, Louis Leggio, Roberta Vicari, and David Hill testified on behalf of defendant.[6] Their unrebutted testimony established the following: that the Sabin vaccine provides much better protection from the wild polio virus than the Salk vaccine; that the odds of contracting the wild polio virus after being immunized by the Salk vaccine are substantially the same as the odds of an adverse reaction from the Sabin vaccine; that since approximately 1985, after plaintiff filed this suit, of the approximately 9,100 patients the testifying physicians have informed of the risk associated with the Sabin vaccine, none refused; that in Louisiana during 1984 physicians administered 200,000 doses of the Sabin vaccine compared with nine doses of the Salk vaccine; that because the Salk vaccine is used so little in this country, there is little information available concerning its safety and effectiveness; and that all of the physicians *431 who testified, including plaintiff's expert, gave their children (or grandchildren) the Sabin vaccine.
Generally, courts have held that when faced with such a slight chance of an adverse reaction, a reasonable person would consent to the treatment even if informed of the risk. See, e.g., Hondroulis, 553 So.2d at 454, where the supreme court noted: "Nondisclosure has been justified when there was a 1.5% chance of a loss of an eye and a one in 100,000 chance of death."; also, LaCaze, 434 So.2d at 1049, where the supreme court held a .5% possibility of a correctable complication would not be a determining factor to a reasonable patient; Distefano v. Bell, 544 So.2d 567 (La.App. 1st Cir.), writ denied, 550 So.2d 650 (La. 1989), where this court held a less than 1% possibility of a correctable complication would not be a determining factor to a reasonable patient; and Koslowski v. Sanchez, 563 So.2d 937 (La.App. 1st Cir.1990) rev'd on other grounds, 576 So.2d 470 (La.1991), where this court held that a less than one in 5,000,000 chance of parathesia would not be a determining factor to a reasonable patient.
According to the Center for Disease Control the risk of a recipient contracting polio from the Sabin vaccine was approximately one in 8,000,000 doses. In light of the unrebutted testimony mentioned above and after balancing the great benefits received from the Sabin vaccine against the slight chance of adverse consequences, and overall cost to society, we feel constrained to hold that a reasonable person made aware of the risk would have consented to the immunization. Although we sincerely and most deeply sympathize with plaintiff's plight, a contrary holding places too great a burden on physicians and the public at large.
Accordingly, the judgment of the trial court is hereby reversed at plaintiff's costs.
REVERSED AND RENDERED.
NOTES
[1] The judgment decreed that Dr. Coogan and his insurer Louisiana Medical Mutual Ins. Co., are liable to plaintiff in solido for the amount of $100,000. The judgment also decreed that the Louisiana Patient's Compensation Fund is liable in the amount of $157,281.47, together with interest on the full sum of $257,281.47, at the legal rate from judicial demand until paid, for all court costs, and for all future medical care and related benefits as provided in LSA-R.S. 40:1299.43 for the remainder of plaintiff's natural life.
[2] Mr. Boyd was not present when plaintiff administered the vaccine.
[3] Jonas Salk discovered the original polio vaccine. The Salk vaccine is administered by an intramuscular injection and contains no live virus. Although the Salk vaccine greatly reduced the incidence of polio in this country, the vaccine did not by any means eradicate the disease. Several years later Albert Sabin discovered an oral vaccine which contains a greatly weakened live virus. The Sabin vaccine proved very effective and further reduced the incident rate of polio in this country by a significant amount, and it rapidly became the vaccine of choice after receiving approval from the American Medical Association and the United States Government. The Sabin vaccine has numerous other advantages over the Salk vaccine. The Sabin vaccine is easier to administer, does not require regular booster doses, provides intestinal and blood immunity (unlike the Salk vaccine which provides only blood immunity), and since the attenuated virus is secreted by the recipient of the vaccine, the Sabin vaccine tends to provide immunization to additional persons through contact. The Sabin vaccine does have a known risk. Unfortunately, on rare occasions, for reasons unknown, the virus reproduced in the intestinal tract is a virulent virus and not the weakened Sabin virus. When this occurs, the person receiving the vaccine and/or persons who come in contact with the recipient risk contracting polio from the vaccine. According to the Center for Disease Control, the risk of a recipient contracting polio is approximately one in 8,000,000 doses.
[4] In 1987, Louisiana promulgated its own regulations which require public health units to seek informed consent from the patient prior to immunization, for, among other things, polio. Louisiana Administrative Code, Title 48, Part V, Subpart 29.
[5] The pertinent portion of the PDR is found on page 1089:

However, prior to administration of the vaccine, the attending physician should warn or specifically direct personnel acting under his authority to convey the warnings to the vaccinee, parent, guardian or other responsible person of the possibility of vaccine-associated paralysis. The Centers for Disease Control report that during the years 1969 through 1980 approximately 290 million doses of TOPV were distributed in the United States. In the same 12 years, 25 "vaccine-associated" and 55 "contact vaccine-associated" paralytic cases were reported. Twelve other "vaccine-associated" cases have been reported in persons (recipients or contacts) with immune deficiency conditions. These statistics do not provide a satisfactory basis for estimating these risks on a per person basis.
(Footnotes omitted.)
[6] At trial, in the interest of time, the parties stipulated that, if called, the testimony of Drs. Bombet, Dunlap, Gibson, Jeansonne, Kleinpeter, Patterson, Heflin, Sessions, Williams, Wood, and Van Gelder would be substantially the same as that of the physicians who testified with regard to what the practices were, et cetera.