SHORTESS, Judge.
Robert “Brown” Philippe (Brown) suffered a stroke in October 1987 while on a “Grand Tour of South America.” The tour was organized by Olson Travelworld, Ltd.[1] The stroke allegedly occurred as he was deplaning in La Paz, Bolivia, after a Lloyd’s Aero Boliviano *809 (LAB) flight from Arica, Chile. Brown sued LAB, Olson-Travelworld Organization, Ltd. (Olson) and its insurer, Home Insurance Company (defendants), alleging he was damaged by LAB’s failure to properly pressurize the plane and Olson’s failure to warn him of the dangers of high-altitude travel, to design a safe itinerary, and to properly care for him after the stroke.[2] Brown’s wife Viola joined in the suit seeking damages for loss of consortium (Brown and Viola Philippe are hereinafter referred to as plaintiffs). After a bench trial, the court found plaintiffs’ damages totaled $1,168,320.09. It assessed fault equally between LAB and Olson. Defendants appealed both liability and damages. Plaintiffs answered the appeal, challenging the trial court’s apportionment of fault to LAB.
The parties stipulated to the following facts. Arica, Chile, is 180 feet above sea level, while La Paz’s altitude is 13,313 feet. Plaintiffs’ flight from Arica to La Paz lasted only thirty to forty minutes. Olson determined the itinerary for the trip. Before leaving on the tour, plaintiffs received four brochures: 1987 Travel World South Amer-ica, Travel Facts, South America Digest, and the Final Itinerary. Karen Bergstrom, an employee of Olson, was the tour leader and arrived with plaintiffs in La Paz.
Plaintiffs contend Olson failed to warn them of the dangers of high-altitude travel and to immediately return Brown to sea level after the stroke. Plaintiffs further contend the design of the tour, including the decision to go to La Paz and to go there by plane from Arica, exposed plaintiffs to an unreasonable risk of harm. Defendants contend, however, that Olson was free from fault because it was completely unforeseeable that Brown might sustain the type injury he suffered, that ^plaintiffs failed to show their damages were caused by altitude, and that such risk was not within the scope of the duty owed to plaintiffs.
Among the terms used by the experts in this case were hypoxia, mountain sickness, and altitude illness. Hypoxia simply means lack of oxygen, although medical experts commonly use the term to refer to problems caused by lack of oxygen. Mountain sickness is a reaction to hypoxia. In its mild form, it causes slight, short-lived light-head-edness, dizziness, and headache. In its acute form, it consists of headache, nausea, vomiting, shortness of breath, and fatigue, sometimes described as feeling like “a bad hangover.” Altitude illness is a much broader term. It refers to the spectrum of ill effects from high-altitude travel ranging from mild headache to stroke.
The trial court found that Bergstrom, as Olson’s employee, had a duty to warn plaintiffs “of the danger of hypoxia or altitude sickness”; that stroke “is a rare but extreme form of altitude sickness”; that Bergstrom was given no special instructions about altitude and medical problems at La Paz and gave plaintiffs no warnings; that Brown’s recovery was impeded by Olson’s failure to immediately arrange to return him to sea level when his symptoms began; that the “accident” caused Brown’s stroke; and that as a result of the stroke, plaintiffs were damaged.
Defendants asserted eleven assignments of error. In their first assignment, defendants contend the trial court erred in finding Olson was obligated under its contract with plaintiffs to protect them from the risk of Brown having a stroke under the facts and circumstances of this case. Defendants argue in their second assignment that the trial court erred in finding Bergstrom had a duty to warn plaintiffs “of the potential of having a stroke” when flying from Arica to La Paz. In their seventh assignment of error, defendants contend plaintiffs failed to prove causation. These assignments of error are interconnected and will be addressed herein under a duty-risk analysis, which our su *810 preme court has recommended as helpful in resolving this type of negligence case.[3]
14Under a duty-risk analysis, four inquiries must all be answered affirmatively for plaintiffs to prevail on a negligence theory, i.e.:
(1) Was the conduct in question a cause-in-fact of the resulting harm?
(2) What, if any, duties were owed by the respective parties?
(3) Were the requisite duties breached?
(4) Was the risk and harm caused within the scope of protection afforded by the duty breached?[4]
Normally we first determine whether the conduct in question was a cause-in-fact of plaintiffs’ harm.
Plaintiffs allege the failure of both Berg-strom and Olson to warn them of the dangers of altitude illness caused their damages. The trial court addressed only Bergstrom’s conduct in its written reasons, finding she had a duty as Olson’s employee to warn plaintiffs of the dangers of altitude illness but failed to do so. The court did not directly address whether her conduct caused plaintiffs’ damages but held Brown was injured “[a]s a result of the accident....”
Defendants contend Bergstrom was only a tour guide and had no duty to warn the plaintiffs of health risks. Alternatively, they argue the warning she gave them was sufficient. Viola testified Bergstrom told them that because of the altitude in La Paz, they should take it easy when they first arrived and should not drink alcohol. Other than a paragraph describing the tour guide’s role in one of Olson’s brochures, there is no evidence in the record that it is required, or even expected, in the travel industry, for a tour guide to advise the tour group of health risks.
Even if we assume for the sake of argument that Bergstrom had a duty to warn plaintiffs of the risk of altitude sickness and failed to do so, was her failure to warn a cause-in-fact of plaintiffs’ damages? Cause-in-fact is generally determined by asking “but for” the defendant’s substandard conduct, would the plaintiff probably have sustained the injuries.
To prove cause-in-fact in this case, plaintiffs were required to show that more likely than not they would have refused to travel to La Paz had they known of the risk of altitude illness. Although the parties state in brief that Bergstrom met plaintiffs in Miami, the only evidence in the record indicating when Bergstrom was Isfirst in contact with plaintiffs is Viola’s testimony that the tour began in Rio. There is no evidence in the record whatsoever to show they would have left the tour either in Rio or at some other point before reaching La Paz had Bergstrom warned them. Thus, plaintiffs have failed to show Bergstrom’s failure to warn them more fully of the dangers of high-altitude travel was a cause-in-fact of their damages.
Plaintiffs had a similar burden of proving they probably would not have gone on the tour to begin with had Olson warned them of the risks. Both Dr. Charles S. Houston and Dr. Peter Hackett, plaintiffs’ and defendants’ experts in altitude medicine, respectively, testified the warnings given by Olson were inadequate. Those warnings are found in two brochures, South America Travel Facts and South America Travel Digest. The first brochure contains the following information:
12. Speaking of medical bills, what can I do to protect myself from illness overseas?
There is not much you can do. A good bet, however, is that if you are not too healthy at home, you are not going to be too well overseas.... The rigors of travel often exacerbate illness, so the best thing you can do to protect yourself is to make sure you start off healthy. See your doctor before the trip. Have a complete physical. Tell him where you are going, how long you will be away, and have him write a short medical history for you....
[[Image here]]
14. What about high altitudes?
*811 Listed below are the frequently visited areas of South America that are in high altitudes:
Bogota, Columbia at 8,669 feet
Quito, Ecuador at 9,350 feet
Cuzco, Peru at 11,000 feet
Machu Picchu, Peru at 8,875 feet
Lake Titicaca, Bolivia at 12,500 feet
When walking in the above cities, we suggest you behave like actors in a slow-motion film. The rarefied air encountered in these areas smells and tastes just like any other except that there is not an oversupply. Occasionally, you might get a headache, but a brief horizontal position usually takes care of that. If you have suffered the effects of high altitudes in the past, see your doctor. There are medications available that can alleviate high-altitude discomforts.
The second brochure provides the following information:
WHAT ABOUT ALTITUDE?
Most people without heart trouble are completely unaffected, but if you are, relax and rest for the first day. If needed, a heart stimulant, Coramina, is available in tablet or liquid form w/o prescription; high-altitude hotels have oxygen tanks_
| eHouston and Haekett agreed these brochures understated the risks of high-altitude travel. Both had written warnings for travel-agency brochures. Haekett testified he did not believe Olson should have included a warning that high altitude could cause stroke because that would only worry or scare people unnecessarily. He believes warnings should concentrate on that which is likely to happen, i.e., acute mountain sickness. Plaintiffs introduced a copy of two health-information brochures Houston helped write for a mountaineering/adventure travel company. These brochures do not mention stroke or give any statistics regarding the number of people who might be affected by altitude. Both brochures provide the following information about AMS:
Acute mountain sickness (AMS) refers to a spectrum of medical problems ranging from mild symptoms to fatal illness that may occur on ascent to altitude. Illness may occur as low as 8,000 feet, but most serious illness is seen above 12,000 feet....
The incidence and severity of AMS depends on altitude attained, but even more important is the rate of ascent. There is individual susceptibility, but no one is immune. ...
[[Image here]]
Most people have experienced (but may not have recognized) mild symptoms of AMS, which include headache, lack of energy and appetite, mild nausea, dizziness, weakness, and insomnia. These symptoms begin 4-12 hours after arrival at altitude and are usually transient, lasting one to two days. But in some persons, progression to more severe symptoms may occur with increased headache, irritability, nausea, vomiting, marked fatigue and shortness of breath with exercise. These symptoms indicate the development of pulmonary or cerebral edema, the most serious forms of AMS.
There is no evidence in the record to show plaintiffs would not have booked this tour of South America with Olson had its brochures given a warning similar to the one above. Brown testified he never read travel brochures but left that job to his vision-impaired wife.[5] She testified she read most of the brochures; she knew they were going into the mountains. She stated they had traveled to Rio in the past, and that she was familiar with the area where they were going.
Viola testified she and Brown were seasoned travelers. In addition to traveling to Rio, they had been to Israel, France, Germany, Italy, Spain, Portugal, |7Ireland, Australia, New Guinea, New Zealand, Canada, and Mexico. They had never had health problems on any of their trips.
Brown was sixty years old and in good health before the trip. Viola testified he never saw a doctor, and the only surgery she knew he had had was a vasectomy. Brown *812 stated he knew of no health reasons that would have kept him from making the trip. He had no high blood pressure, heart disease, or circulation problems. Hackett and Houston both testified there was nothing in Brown’s medical history to indicate he was at risk for a trip to La Paz or any other high-altitude area. Dr. Richard L. Strub, the neurologist who treated plaintiff after he returned from Bolivia, agreed. Each of the three doctors stated that if Brown had come to him before the trip, he would have told Brown there was no medical reason for him not to go.
At trial, Brown was asked if he would have made the trip had he known La Paz was the highest capital city in the world. (That information is contained in one of the brochures provided by Olson.) He initially said no, then changed his answer and said he probably would have done nothing different had he known. He was also asked the following hypothetical question: “If you had been told that between 30 and 50 percent of people were going to get sick going there and one out of a hundred would have a fatal illness, possibly a fatal illness, going to that highest capital, would you have gone?” He answered, “No.” Defense counsel then objected to the form of the question, to which plaintiffs’ counsel replied, “I said if he were told that. I didn’t say — This hypothetical question overstates the risks of high-altitude travel,[6] and neither expert testified such a warning should have been given.
Plaintiffs did not prove that, “but for” Olson’s failure to include more accurate information about the risks of high-altitude travel in its brochures, Brown would not have gone on this trip and thus would not have suffered a stroke when deplaning atjgLa Paz. Consequently, plaintiffs failed to show Olson’s substandard conduct was a cause-in-fact of then-damages, the first element required under a duty-risk analysis. The trial court was clearly wrong in finding defendants hable based on a failure-to-warn theory.
Plaintiffs also alleged Olson designed the trip itinerary in such a way as to pose an unreasonable risk of harm to plaintiffs. Plaintiffs contend Olson should have arranged the tour with more time for the travelers to acclimate and a less abrupt change in elevation. Plaintiffs failed, however, to introduce evidence of a feasible alternative itinerary. The only evidence regarding the itinerary was the testimony of Ron Folk, Olson’s director of tour planning. He testified that given the geographies of Peru and Bolivia, there was no alternative that did not involve at least a 9,000-foot-elevation difference, as follows:
Q. Once the decision was made to include La Paz in the tour, what considerations went into flying to La Paz as opposed to using land transportation?
A. Again in the itinerary and the geographies of the area, you’re kind of limited on how you go about from one place to another. The way this tour is routed and the way it operates or operated in ’87, you are going from Santiago to La Paz, that’s the only way to go. If you were to drive, I don’t know if you could even drive, but it would probably take you possibly three weeks. I don’t think there is a train. The train would not be palatable for American tourists, so we fly on a commercial airline with regularly scheduled flights.
Q. The visit to La Paz, I think, is the highest point on this tour, is that correct, and Lake Titicaca?
A. Lake Titicaca, right.
Q. From La Paz, the itinerary, I believe, went to Puno?
A. Puno, which is also at 12,000.
Q. Cuzco?
A. Eleven thousand.
Q. Lima?
*813 A. Lima is at sea level.
Q. Was any consideration given to reversing that and coming up the mountains instead of coming down the mountains?
A. We have done that on occasion. There’s not that much difference because going the opposite direction, you’re going from a level to 11,000 feet. Going from Santiago to La Paz, going from 3,000 to 12,000. So, that changes 9,000 feet going one way and 11,0001 agoing the other way. So, besides, you’re going to Santiago to La Paz, it’s less of a change than going from Lima to Cuzco.
The trial court made no factual findings regarding whether a feasible alternative itinerary was available. We find plaintiffs failed to carry their burden of proof under this theory, as they put forth no evidence to support it.
The court also found Brown’s “partial limited recovery was delayed and impeded by Olson’s failure to arrange for his immediate return to sea level when his symptoms began.” (We assume the trial court meant Bergstrom’s failure, as Olson’s employee.) Defendants contend this factual finding is manifestly erroneous.
Factual findings should not be reversed on appeal absent manifest error. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). If the trial court’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990). Consequently, when there are two permissible views of the evidence, the fact-finder’s choice between them cannot be manifestly erroneous or clearly wrong. Housley v. Cerise, 579 So.2d 973, 976 (La.1991); Sistler, 558 So.2d at 1112.
Brown and Viola were accompanied on this trip by Brown’s brother, Alfred “Blue” Philippe, and his wife Lillian. They all noticed Brown was acting strangely when he deplaned in La Paz. He spoke loudly and told Blue he was “high as a kite.” He spent much of the next twenty-four hours sleeping. Viola testified she did not tell Bergstrom about Brown’s unusual behavior until the day after they arrived in La Paz. Bergstrom arranged for a doctor to see Brown. The doctor gave him oxygen and some medication. He did not order Brown returned to sea level. We do not believe that Bergstrom, who had no medical training, had a duty to second guess the doctor.
The next day, when they arrived in Cusco after an all-day train ride during which Brown slept, Viola told Bergstrom Brown had not improved. Bergstrom again found a doctor. This doctor recommended Brown return to sea level the next day. Bergstrom made those arrangements, and Brown and Viola flew to Lima the next morning. These actions were reasonable under the facts of this case.
Furthermore, after reviewing the entire record, we find no support in the record for the trial court’s finding that Brown’s recovery was delayed and impeded hpby the failure to immediately return him to sea level. Houston, plaintiffs’ expert, was unable to state a faster return to sea level could have changed the outcome in this case. He testified:
Q. Okay. And should he have been taken down the mountain immediately?
A. Yes. Immediately it was recognized that something was wrong, yes.
Q. And do you think that that could have made any difference in his ultimate outcome?
A. I have thought a great deal about that. It is impossible to say. But I think we have to realize that if someone has a stroke at sea level around here or an impending stroke or a suggestion of a stroke we don’t diddle around, we call an emergency ambulance, and you go to the emergency room, and you get emergency treatment. And I assume that we do that because we think it has some beneficial effect. But this is beyond my area of competence.
(Emphasis added.)
Hackett, who practices emergency medicine and sees many stroke victims in the emergency room, testified moving Brown to a lower altitude sooner would have made no difference. He stated:
*814 Q. Now, if we assume that Mr. Philippe did have this stroke as soon as he stepped off the airplane, just assume that to be a fact, had they taken him down to a lower altitude sooner than in fact he did go down to the lower altitude, would that have made a difference?
A. If we assume that he had the stroke at that time, then it really wouldn’t have made any difference. The damage was already done.
Q. So it wouldn’t have made any difference whether they had taken him down to a lower altitude that very day or one or two days later, would it?
A. I don’t think so.
Q. How about if they had gotten him to a doctor, say, one or two days earlier than they did, would that have made a difference?
A. I don’t think so because there is no treatment for this kind of stroke.
Q. So oxygen wouldn’t have been of any help to him either if he had been given oxygen?
A. No.
Q. And you treat a lot of stroke victims I’m sure in your practice?
A. In my emergency practice, I see stroke very often.
InQ. Is there any treatment for it really?
A. Not this kind of stroke, no.
Based on the evidence in the record, the trial court’s finding that Brown’s recovery was impeded by the failure to arrange for his immediate return to sea level is not a permissible view of the evidence but is manifestly erroneous.
In summary, we find the trial court erred in finding the lack of adequate warning caused plaintiffs’ damages; there is no evidence in the record that the lack of warning was a cause-in-fact of those damages. We find no evidence to support plaintiffs’ theory, which was not addressed by the trial court, that the design of the itinerary was unreasonably dangerous. We also find the trial court’s factual finding that Olson and Berg-strom impeded Brown’s recovery by failing to return him to sea level quickly enough to be wholly unsupported by the record and thus clearly wrong. For these reasons, we reverse the trial court’s judgment and render judgment in favor of defendants, Olson-Tra-velworld Organization, Ltd., and Home Insurance Company, dismissing plaintiffs’ suit at plaintiffs’ costs.[7]
REVERSED AND RENDERED.

. The parties stipulated the tour was organized by "Olson Travelworld, Ltd.,” although all the pleadings refer to "Olson-Travelworld Organization, Ltd.”

. Plaintiffs also sued LAB; Travelworld, a subsidiary of defendant; Alana International Travel, which sold him the tour package; and Commercial Union Insurance Company, Alana’s insurer. Plaintiffs settled with LAB before trial. Alana was dismissed on an exception of no cause of action. Commercial Union apparently was never dismissed. Travelworld was not dismissed but is not named in the judgment.

. See Faucheaux v. Terrebonne Consol. Gov’t, 615 So.2d 289, 292 (La. 1993).

. Id.

. Viola was bom with albinism and can read only with the help of a magnifier. Plaintiffs’ counsel described her in brief as "nearly blind.”

. This is not a case like Boyd v. Louisiana Medical Mutual Insurance Company, 593 So.2d 427 (La.App. 1st Cir.1991), where the risks were clearly quantified. Houston and Hackett testified ten to fifty percent of the people traveling to high altitudes have some, usually short-lived, symptoms of mountain sickness, including headache, dizziness, or light-headedness. (Although the trial court stated in the first paragraph of its written reasons that Brown suffered these symptoms, this is not supported by the record.) Houston further testified, "[V]ery approximately” one percent of the people who go to 13,000 to 14,000 feet will face "some sort of life-threatening disease or illness.”

. Because of our findings on these issues, we pretemiit discussion of defendants’ remaining assignments of error and plaintiffs’ answer to appeal.