544 So.2d 567 (1989)
Sylvia R. DISTEFANO
v.
Martin L. BELL, M.D.
No. 88 CA 0449.
Court of Appeal of Louisiana, First Circuit.
May 16, 1989.
Rehearing Denied June 23, 1989.
*568 Stephen M. Irving, Baton Rouge, for plaintiff-appellant Sylvia R. Distefano.
Daniel Reed, Gary L. Boland, Baton Rouge, for defendant-appellee Martin L. Bell, M.D.
Before WATKINS, CRAIN and ALFORD, JJ.
WATKINS, Judge.
Plaintiff-Appellant, Sylvia R. Distefano, sued her doctor, Martin L. Bell, for damages resulting from complications arising after surgery. The case was tried before a judge who dismissed the plaintiff's claims. We affirm.
The sole issue before us on appeal is whether Dr. Bell made sufficient disclosures to Mrs. Distefano, prior to performing the surgery, to obtain her informed consent to the operation.

FACTS
On October 2, 1981, the plaintiff was involved in an automobile accident wherein she sustained several minor injuries to her face. The injuries included lacerations on her forehead and eyelids as well as an impact injury to her nose. She was taken to the emergency room at Our Lady of the Lake Regional Medical Center where she was initially seen by an emergency room physician. However, because the injuries were to her face, Dr. Bell, the plastic surgeon on call for the hospital that evening, was called to treat her. Dr. Bell sutured the cut above her eye and asked to see her several days later in his office. On October 6, 1981, the plaintiff saw Dr. Bell at his office to have her sutures removed. During this procedure the plaintiff inquired into the possibility of having plastic surgery performed on her face. Although the matter was initially brought up in a joking manner, the discussion ended with the plaintiff tentatively agreeing to have a rhinoplasty performed on her nose. The plaintiff testified that Dr. Bell did not discuss possible complications of surgery during this visit; however, he did tell her that sometimes a second surgery is necessary in order to achieve the exact aesthetic appearance desired. He also told her that there was no pain involved and only minimal discomfort. The plaintiff recalled no mention *569 of possible malfunction or loss of function of her nose as a result of surgery. Dr. Bell testified that during this visit he discussed the risks of rhinoplasty as well as the possible benefits. Several days later the plaintiff received a brochure from Dr. Bell on rhinoplasty. The plaintiff read the brochure and returned to Dr. Bell's office on October 14, 1981, for a pre-operative visit. Dr. Bell and his nurse, Landa Liggett, testified that Dr. Bell saw the plaintiff that day to discuss her surgery and answer any questions she might have. Dr. Bell testified at length about the disclosures he made during this pre-operative visit, including the possible loss of function of the nose. Pre-operative pictures of the plaintiff's nose were also taken. The receptionist testified that during this visit she had the plaintiff sign the necessary surgical consent forms. The plaintiff's version of this pre-operative visit is quite different from that of Dr. Bell. The plaintiff testified that Dr. Bell was not in the office that day and that the only thing she did was pose for pre-operative pictures. She further testified that it was not until the morning of surgery, while she was being prepped for surgery, that she signed the necessary consent forms.
The surgery was performed without complication on October 20, 1981. However, apparently as a result of an aberration in the healing process, the plaintiff developed a functional problem wherein her left nostril collapses when she inhales. The problem is internal and cannot be detected from the outside of the nose. The collapsing of the valve area causes a lack of air flow through the nose, resulting in pooling of mucus and drippage. The medical experts explained that a collapsing valve occurs when the supporting cartilage of the nose becomes weakened and is no longer able to support the surrounding tissue. There are many possible causes of this condition, among them the removal of too much cartilage during the surgery, or a post-operative infection which causes a necrosis or weakening of the cartilage.
The trial court, in its reasons for judgment, found that Dr. Bell did not inform Mrs. Distefano of the risk of loss of function and because the loss of function is a known risk of rhinoplasty, Dr. Bell did not properly inform the plaintiff. However, the court determined that the lack of information concerning the possible loss of function was not the cause of plaintiff's damages. The court concluded that even if the plaintiff had been informed about the possible loss of function she would have consented to the surgery anyway.
The requirements for informed consent are set forth in the Uniform Consent Law, LSA-R.S. 40:1299.40, as follows:
A. Notwithstanding any other law to the contrary, written consent to medical treatment means a consent in writing to any medical or surgical procedure or course of procedures which (a) sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures, (b) acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner, and (c) is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.
B. Except as provided in Subsection A of this Section, no evidence shall be admissible to modify or limit the authorization for performance of the procedure or procedures set forth in such written consent.
C. Where consent to medical treatment from a patient, or from a person authorized by law to consent to medical treatment for such patient, is secured other than in accordance with Subsection A above, the explanation to the patient or *570 to the person consenting for such patient shall include the matters set forth in Paragraph (a) of Subsection A above, and an opportunity shall be afforded for asking questions concerning the procedures to be performed which shall be answered in a satisfactory manner. Such consent shall be valid and effective and is subject to proof according to the rules of evidence in ordinary cases.
The recent Supreme Court case of Hondroulis v. Schuhmacher, 531 So.2d 450 (La.1988), reh'g granted, (La. Dec. 1, 1988),[1] redefined the extent of information required in order for a physician to comply with the mandate of LSA-R.S. 40:1299.40. Up until this point the case of LaCaze v. Collier, 434 So.2d 1039 (La.1983), was the leading case on informed consent. In LaCaze the Court stated that "under the statutory rule, the consequences are listed, and the physician's requirement is to disclose all known risks of the listed consequences occurring, whether or not the probability of the occurrence is remote." (Emphasis in original.) Id. at 1046. The Hondroulis Court disagreed with the scope of this rule, stating that "[d]espite the dicta in LaCaze, a reasonable limitation on the `known' risks which must be disclosed is implied in the statute. A rare or remote risk need not be disclosed.[2] Disclosure must be made only when a risk is medically known and of a magnitude that would be material in a reasonable patient's decision to undergo treatment." Hondroulis, supra, at 455 (footnotes omitted). The court held that a risk is material when the probability of harm is sufficient to have influenced the treatment decision of a reasonable person in the patient's condition.
The plaintiff is therefore required to show that: (1) the adverse results of her surgery were known, significant, and material risks which should have been disclosed to her by Dr. Bell; (2) those risks were not disclosed by Dr. Bell; (3) she was unaware of those risks; and (4) a reasonable person would have refused the surgery because of the risks. Hondroulis, supra at 455.
Initially we note that the written consent forms signed by the plaintiff do not satisfy the requirements of Subsection A of the statute. Although the forms state that the plaintiff was given sufficient information concerning her surgery, the forms do not contain any information concerning possible complications of surgery. As such, the written consent forms fail to meet the threshold requirements of Subsection A, and accordingly no presumption of validity of consent arises. We also note with interest the fact that one of the consent forms signed by the plaintiff specifically requested to have the "LEAST LIKELY" complications described to her.
According to Subsection C of the statute, oral consent may be valid and effective only if the disclosures listed in Subsection A are made and the patient is given an opportunity to have questions concerning the procedure satisfactorily answered. A party may establish informed oral consent by proof according to the rules of evidence in ordinary cases.
The probability of harm and the gravity of the harm are the first factors to consider in determining the significance and materiality of any potential risk. These factors are of a scientific nature and can be established by the testimony of competent physicians. The medical testimony in this regard revealed that approximately 4-5% of rhinoplasty patients suffer a short term blockage problem and under 1% of the patients suffer from a long-term valve collapsing *571 problem, like that of the plaintiff.[3] The plaintiff's condition was described by all of the medical experts as a well known complication of rhinoplasty, but also very rare. When two of the medical experts were asked whether other patients normally refused surgery when informed of this potential risk, they replied, "[n]o, very rarely".
Ordinarily the probability of harm is counter-balanced by the consequences of the patient rejecting treatment. In other words the plaintiff's condition at the time of surgery is a relevant factor in determining whether a reasonable person in her shoes would have considered the undisclosed risk of harm sufficient to have influenced his or her decision to undergo the surgery. In the instant case the plaintiff's surgery was purely elective, stemming from a long history of subjective dissatisfaction with the appearance of her nose. Although this reason may not be as compelling as the prospect of suffering physical pain or death as a result of rejecting treatment, it is nevertheless a valid reason. According to the plaintiff's testimony she is very pleased with the appearance of her nose since the surgery and she undoubtedly no longer suffers from the emotional pain as she once did. However she contends that because she is allergic to most antibiotics, the gravity of the harm in her case was higher and that she would have refused the surgery had she known that a post-operative infection could cause loss of function.[4]
The issue of whether a particular risk is material is also influenced by the possibility of correction. The testimony of Dr. Charles Gruenwald, Jr. and Dr. Lawrence L. Braud, both physicians who have examined the plaintiff, suggested that the plaintiff's problem can most likely be corrected by a second or perhaps third surgical procedure. Each agreed that the subsequent surgeries would not be as extensive as the first. However, Dr. Braud stated that there was no guaranty that the corrective surgeries would fix the problem. Should the plaintiff decide to have the corrective surgery, it would involve the removal of cartilage from her ear and the placement of the cartilage in her nose to provide the needed support.[5]
An additional circumstance involved in the instant case is the fact that the plaintiff specifically requested to have the LEAST LIKELY complications of the surgery described to her. Given this fact, and the knowledge of the medical community with regard to this particular type of complication, we find that the plaintiff established that risk of loss of function of her nose was significant and material and that Dr. Bell should have disclosed the risk to her.
The plaintiff's next hurdle was proving that Dr. Bell did not inform her of the possible loss of function of her nose. The testimony concerning the disclosures made to the plaintiff are contradictory. The trial court chose to believe the plaintiff's version and accordingly found that she was not sufficiently informed concerning the known risk of loss of function.
It is well settled that the conclusions by the trier of fact should be affirmed by the appellate court unless the record reflects that the conclusions of fact are not supported by the evidence. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), Canter *572 v. Koehring Company, 283 So.2d 716 (La. 1973). Further, where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Canter, supra. We find the evidence supports the trial court's finding that Dr. Bell did not disclose the fact that loss of function was a possible complication of a rhinoplasty. Furthermore, the evidence establishes that although the plaintiff was aware of the general dangers of surgery, she was not aware of the particular risk of loss of function of her nose.
If consent is found to be deficient pursuant to the statute, a plaintiff must then prove that the failure to inform caused the damaging consequences. If the plaintiff would have undertaken the treatment in any event, in spite of the deficient informed consent, there can be no recovery. LaCaze v. Collier, supra at 1048. Under LaCaze, the test in determining causation is objective. Only when an undisclosed risk would have induced a reasonable person in the patient's condition to refuse treatment is there a causal connection between the physician's failure to inform and the patient's injury. We find no causal connection in the instant case. Given the rarity of occurrence (less than 1%); the less than severe nature of the condition; the fact that it is most likely correctible with a second surgery; and the less than attractive appearance of the nose, we conclude that a reasonable person would not have refused surgery.
For the foregoing reasons, the judgment of the trial court is affirmed. All costs to be paid by the appellant.
AFFIRMED.
NOTES
[1] The petition for rehearing filed in the Hondroulis case reveals that rehearing was granted by the Supreme Court to consider whether the case should be remanded to the trial court to allow the plaintiff-applicant, Viola K. Hondroulis, an opportunity to present additional evidence to rebut the presumption of informed consent; reconsideration of the Court's interpretation of LSA-R.S. 40:1299.40 was not requested.
[2] The court went on to conclude that "[a]lthough the statute seems to require that all known risks in the various categories be disclosed, this would be an impractical, unrealistic, and unwieldly interpretation.... A fair reading of the statute indicates that its enumeration of risks is merely a listing of the possible results about which disclosure must be made." Hondroulis, supra at 454.
[3] The Court in Hondroulis, supra at 454, noted the following similar cases: "Disclosure has been required when there was a three percent chance of death, paralysis or other injury, and when there was a one percent chance of loss of hearing. Nondisclosure has been justified when there was a 1.5% chance of loss of an eye and a one in 100,000 chance of death. In Hartke v. McKelway, [707 F.2d 1544 (D.C.Cir.1983), cert. den. 464 U.S. 983, 104 S.Ct. 425, 78 L.Ed.2d 360 (1983) ] the physician was held liable for failing to disclose that there were one to three chances of pregnancy in a thousand laparoscopic cauterizations." We also note that in LaCaze the court held that a .5% possibility of a correctable complication would not be a determining factor to a reasonable patient.
[4] Several of the doctors who testified explained that they give all their rhinoplasty patients antibiotics as a prophylactic measure even though the appropriate standard of care did not require the use of such and the risk of infection is very low.
[5] Dr. Bell also testified that he recommended a second corrective surgery.