577 So.2d 1090 (1991)
Sal MIKE, Jr.
v.
Ralph MAXWELL, III, M.D.
No. 89 CA 2051.
Court of Appeal of Louisiana, First Circuit.
March 28, 1991.
*1091 Leonard Yokum, Jr., Hammond, for plaintiff-appellant.
Edward J. Rice, Jr., New Orleans, for defendant-appellee.
Before EDWARDS, WATKINS and LeBLANC, JJ.
WATKINS, Judge.
Sal Mike, Jr. sued Dr. Ralph Maxwell, III for medical malpractice in the performance of a "radial keratotomy" (RK) on the left eye, a surgical procedure specifically intended to reduce nearsightedness. Following a non-jury trial on the merits, the trial court rendered judgment in favor of Dr. Maxwell and against Mr. Mike. Plaintiff has appealed. We affirm.

FACTS
On October 25, 1984, Dr. Maxwell, a specialist in ophthalmology, performed an RK upon Mr. Mike's left eye. The procedure attempts to correct nearsightedness by weakening the peripheral cornea by a series of cuts, so that the central cornea can drop back against the iris. Ideally, a patient undergoing the procedure no longer requires glasses or contact lenses to correct vision.
At the time the surgery was performed upon Mr. Mike, RK was a relatively new procedure in the United States. The plaintiff's medical expert, Dr. Louis G. Perez, testified that prior to about 1983, the procedure was considered to be "way out, far out." Dr. Maxwell received training in the RK procedure in May, 1984, and observed several such surgeries at Louisiana State University. He had no long-term experience with the procedure at the time he performed Mr. Mike's surgery.
It is uncontested that the results of the surgery were not ideal. Prior to surgery, Mr. Mike's vision in his left eye was 20/100; with contact lenses, it was 20/20. After the surgery Mr. Mike's vision initially improved, but by the fall of 1985 Mr. Mike's uncorrected vision in his left eye, although better than before surgery, was about 20/70.
It is also undisputed that Mr. Mike's remaining nearsightedness is correctable by a second RK. Although Dr. Maxwell failed to achieve the ideal cutting depth with his incisions, he avoided one of the greatest risks inherent in the RK procedure, the danger that the eye will be permanently damaged if the cuts are too deep. Even if a doctor correctly sets the cutting device to cut to a certain depthand it is uncontradicted that Dr. Maxwell accurately calibrated the depththe inherent danger is that the doctor will cut too deeply into the eye, resulting in cataracts, permanent injury, or irreversible overcorrection.
Prior to surgery, the nature of the surgery, the risks involved, and alternative treatments were disclosed to Mr. Mike. Mr. Mike consented in writing twice to the performance of the procedure.
At the trial four witnesses gave testimony: Mr. Mike and Dr. Louis G. Perez, for the plaintiff; Dr. Maxwell and Dr. Herbert *1092 E. Kaufman, for the defendant. Prior to trial a medical review panel considered Mr. Mike's complaint and rendered a unanimous opinion in favor of Dr. Maxwell.

LEGAL ISSUES
Appellant's assignments of error raise two issues.[1] First, is a patient's consent, evidenced by his signatures on written forms, vitiated by the failure of a surgeon to inform the patient of the possible need for additional surgery in 15 percent of the cases? Second, does an expert witness who testifies that a doctor has not committed malpractice but has performed surgery commensurate with his degree of experience either usurp the function of the trier of fact or impose an impermissible dual standard of care for inexperienced versus experienced surgeons?

Informed Consent:
Pretermitting any discussion of whether the informed consent issue was properly raised at the trial level, we find that there is evidence in the record to support a finding that Mr. Mike was fully informed of the risks inherent in RK. A patient's signing of consent forms raises a rebuttable, not a conclusive, presumption of informed consent, [Hondroulis v. Schuhmacher, 553 So.2d 398 (La.1988) (on rehearing) ]. We note that prior to the surgery, Mr. Mike signed three consent forms, two of which are pertinent here.
The form entitled "Informed Consent for Radial Keratotomy" enumerated the risks involved in the surgery; that the results of surgery could not be guaranteed to achieve the desired goal; and that he could have problems with glare, night vision, star pattern around lights and variable visual acuity. The consent form also made it clear that there was a possibility that Mr. Mike's vision would be made worse and that he could in fact lose an eye. He further acknowledged that a "lack of permanent corneal curvature change may occur." Finally, he stated that he understood that should complications arise, "[I]t may be necessary to have further treatment."
Mr. Mike also signed a "Consent to Medical or Surgical Procedures or Course of Procedures" at West Park Hospital. That statement included a number of risks associated with the RK procedure, including bleeding, scarring, and the "possible need for additional operations to correct any complications." Mr. Mike was informed of the significant risks associated with radial keratotomy, including the risk that if the procedure did not achieve its ideal result, a correctional operation would be advisable.
But even if we were to assume, for the sake of discussion, that Mr. Mike was not made aware of the risk of additional surgery, under the law of Louisiana Mr. Mike cannot recover for lack of informed consent unless he can prove that, with the additional information that he was denied, a reasonable person in like circumstances would not have consented to the surgery. Hondroulis v. Schuhmacher, supra.
We affirmed a trial court judgment denying recovery for this reason in the recent case of Distefano v. Bell, 544 So.2d 567 (La.App. 1st Cir.), writ denied, 550 So.2d 650 (La.1989). We explained:
If consent is found to be deficient ... a plaintiff must then prove that the failure to inform caused the damaging consequences. If the plaintiff would have undertaken the treatment in any event, in spite of the deficient informed consent, there can be no recovery. (Citation omitted.) [T]he test in determining causation is objective. Only when an undisclosed risk would have induced a reasonable person in the patient's condition to refuse treatment is there a causal connection between the physician's failure to inform and the patient's injury.
544 So.2d at 572.
As we did in Distefano, we find no causal connection here. Given the relatively small percentage of need for additional surgery (15 percent), the less than severe nature of the condition (an undercorrection as opposed to a tragic overcorrection), and the nature of the condition as correctible by *1093 more surgery, we conclude that a reasonable person would not have refused surgery.
Because of a lack of causal connection between the allegedly deficient consent and the decision to have the surgery, we need not consider the admissibility vel non of a tape recording Mr. Mike made of a conversation with Dr. Maxwell after the surgery. Even if Dr. Maxwell's statements regarding the risks to be encountered in a second surgery are relevant to the issue of informed consent to the first surgery, the statements cannot fill the void created by the absence of a causal connection.
Consequently, we find no merit in plaintiff's assignment of error on the issue of informed consent.

Standard of Care:
The crux of the plaintiff's negligence claim is that the doctor did not make the type of incisions he had planned to make on Mr. Mike's eye. Dr. Perez, the plaintiff's expert, testified that a surgeon will have a formula for performing a RK on an individual patient. In Dr. Perez's opinion, his examination of the plaintiff revealed that the incisions were not in conformity with the proper formula because they were too shallow, to a depth of forty percent instead of ninety-five percent. He also found that the incisions had been made into the white of the eye (sclera), which should not have been done, and that the incisions were not straight (seven of the eight were "wavy"). When asked whether he thought the surgery had been performed properly, Dr. Perez answered, "No."
Dr. Kaufman, the defendant's expert, admitted that the cuts were "not ideal," but were shallow, wavy, and irregular. Nevertheless, Dr. Kaufman noted that the RK procedure is not a precise operation but is more of an "art." He explained that Dr. Maxwell had done an adequate job for one who was just beginning to perform that type of surgery.
It was Dr. Kaufman's testimony concerning the lack of experience of Dr. Maxwell which prompted the plaintiff's reasoning that Dr. Kaufman was creating a dual standard of care for physicians such as himself and Dr. Maxwell: one for an experienced specialist and another, less stringent standard for an inexperienced specialist. However, when we read the deposition testimony of Dr. Kaufman, we find that the testimony does not bear out plaintiff's argument. Dr. Kaufman did not testify that if Dr. Maxwell had had a great deal of experience with the RK procedure and nevertheless had gotten the results he did with Mr. Mike that he would have been guilty of negligence. Indeed, Dr. Kaufman stated, "I can't tell you that I or anybody else would necessarily have gotten more correction if we had done it any different." And, speaking of Dr. Maxwell specifically, Dr. Kaufman stated, "Yeah, well, I think that there is a chance that with more experience, Dr. Maxwell would have done better, but I think there is also a chance that no matter how much experience he had, he would have gotten just the same result."
The record is devoid of evidence to support plaintiff's allegation that Dr. Maxwell was negligent in performing an RK because he lacked sufficient background, training, or knowledge in this type of surgery.
As to the other allegations of negligencenot making incisions to the proper depth, making wavy or irregular incisions instead of straight incisions, and making incisions that extended into the sclerathe opinions of the experts differ, at least semantically. The plaintiff's expert testified that the surgery was "not proper"; the defendant's expert testified that the results were "not ideal."
The trial court chose to believe the defendant's expert and accordingly found that Dr. Maxwell did not breach a duty of care to Mr. Mike. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact made by the trial court should not be disturbed upon review. Distefano v. Bell, supra, citing Canter v. Koehring Company, 283 So.2d 716 (La.1973).
The fact that the trial court gave greater weight to the opinion of Dr. Kaufman *1094 than to the opinion of Dr. Perez is not tantamount to the trial court's allowing the expert witness to usurp the function of the trier of fact. The mere fact that Dr. Kaufman testified that he did not conclude that Dr. Maxwell had committed malpractice in no way suggests that the trial court did not consider all of the evidence presented before reaching the same conclusion. There is ample evidence in the record to support the result reached. Accordingly, we find no manifest error in the decision of the trial court.
Our decision today is consistent with previous Louisiana jurisprudence pertaining to medical malpractice. The plaintiff has the burden of proving through expert witnesses that the defendant breached the standard of care in his particular specialty. A physician is not required to use the highest degree of skill and care possible, and he does not guarantee a perfect result. Mariano v. Tanner, 497 So.2d 1066 (La.App. 5th Cir.1986), writ denied, 501 So.2d 235 (La.1987). Despite the best skill and judgment of competent doctors, unfortunate results may occur. Delaneuville v. Bullard, 361 So.2d 918 (La.App. 4th Cir.), writ denied, 363 So.2d 1385 (La.1978).
Accordingly, we affirm the judgment of the trial court, and we cast appellant for costs of the appeal.
AFFIRMED.
NOTES
[1] A third issue, that of damages, does not warrant discussion in view of our decision to affirm the trial court's judgment dismissing the plaintiff's suit.