639 So.2d 261 (1993)
John L. YAHN, et al., Plaintiffs-Appellants,
v.
Dr. Craig P. FOLSE, et al., Defendants-Appellees.
No. 25176-CA.
Court of Appeal of Louisiana, Second Circuit.
October 27, 1993.
Opinion on Rehearing April 14, 1994.
Writ Denied September 2, 1994.
*263 Edmund Thomas, Shreveport, Richard Voelker, Baton Rouge, for plaintiffs-appellants.
Hayes, Harkey, Smith, Cascio & Mullins by Haynes L. Harkey, Jr., Monroe, for defendants-appellees.
Before LINDSAY, HIGHTOWER and BROWN, JJ.
LINDSAY, Judge.
This is a medical malpractice case. The plaintiffs, the children of John L. Yahn, are Frank Yahn, Beverly Yahn Sanders, Donald F. Yahn and Lewis Yahn. They contend that Dr. Craig P. Folse performed an arteriogram upon their father without consent. Mr. Yahn suffered a stroke during the procedure and died approximately one year later. The trial court rejected the plaintiffs' demands. For the following reasons, we affirm.

FACTS
In February, 1988, John Yahn, who was then 82, was referred to Dr. Robert Massingill after experiencing three episodes of dizziness and fainting in a two year period. Dr. Massingill's examination revealed an aortic aneurysm in the abdomen. Although this was not thought to be the cause of Mr. Yahn's fainting spells, it was a serious, life-threatening condition. Dr. Massingill admitted Mr. Yahn to Richland Parish Hospital for further testing to determine the cause of the fainting and to evaluate whether Mr. Yahn's physical condition was such that he would be a candidate for surgical repair of the aneurysm.
A CT scan of the brain was done as well as chest x-rays and a bilateral carotid artery ultrasound. Plaque formation was discovered in the right carotid artery and ulceration of plaque was discovered in the left carotid artery. The carotids are arteries leading to the brain. Although the blood flow through these arteries was not significantly restricted by the plaque, there was some concern that bits of plaque from the ulceration could break loose and cause a stroke.
Dr. Massingill referred the patient to Dr. Folse, a radiologist, who determined that an arteriogram was necessary to study Mr. Yahn's carotid arteries and the abdominal aneurysm. An arteriogram is an invasive technique which creates some risk of harm to the patient, including stroke. In this procedure, a catheter and guide wire are inserted into an artery in the leg. The catheter and wire are advanced to the necessary point in the arteries and a radiopaque material is injected. The flow of the material through the arteries is then studied.
On February 23, 1988, prior to performing the arteriogram, Dr. Folse went to Mr. Yahn's room to explain the procedure and to obtain his consent. The parties disagree regarding the events that transpired in Mr. Yahn's room.
Dr. Folse, who had never met Mr. Yahn, claims that he recognized that the patient was hard of hearing. Dr. Folse stated that he explained the procedure and risks to Mr. Yahn and told him that the physicians thought that he needed to have the procedure. *264 Dr. Folse stated that no signed consent was obtained because Mr. Yahn's daughter, Beverly Sanders, became upset and opposed the procedure. He stated that he talked with Mrs. Sanders outside the room. Dr. Folse testified that he couldn't recall what Mr. Yahn said, but it was his impression when he left the room that he had Mr. Yahn's consent to the procedure.
According to Mrs. Sanders, she told Dr. Folse that her father was illiterate and hard of hearing. Mrs. Sanders became upset when Dr. Folse mentioned that the procedure carried the risk of stroke and she opposed the procedure. When Dr. Folse told Mr. Yahn that he needed to have the procedure done, he responded, "Okay." However, Mrs. Sanders contends that when she told her father that she did not want him to have the procedure, he also responded, "Okay."
Shortly after Dr. Folse departed, Mr. Yahn was taken out of his room and the procedure was performed. During the arteriogram, Mr. Yahn suffered a stroke which paralyzed one side of his body. Thereafter, he was not able to live independently as he had before entering the hospital and required special care to feed, clothe, bathe and care for his basic needs. Mr. Yahn convalesced at his daughter's home from the date of his release from the hospital on April 4, 1988 until June 3, 1988, when he was transferred to a nursing home. Mr. Yahn had died on February 17, 1989. His death certificate lists the cause of death as a cerebrovascular accident, commonly known as a stroke. There was no indication that Mr. Yahn had another stroke following that which he suffered during the arteriogram.
The plaintiffs contend that their father's death resulted from the stroke suffered during the arteriogram. They filed a complaint with a medical review panel, claiming that Dr. Massingill, Dr. Folse, and the Richland Parish Hospital were negligent in performing the arteriogram and in failing to obtain consent for the procedure. On August 30, 1990, the medical review panel found that the evidence did not support a finding that Dr. Massingill, Dr. Folse or Richland Parish Hospital failed to meet the applicable standard of care in performing the arteriogram. However, the panel found that there were important issues of fact regarding the lack of a signed consent. The review panel found that these questions turned on issues of credibility which did not fall within the province of the panel to decide and should be submitted to the court for decision.
On November 28, 1990, the plaintiffs filed suit in district court against Dr. Massingill, Dr. Folse and Richland Parish Hospital for damages in connection with the death of Mr. Yahn. On November 19, 1992, the trial court entered judgment in favor of the defendants, rejecting the demands of the plaintiffs.
In reasons for judgment, the trial court found no liability on the part of Dr. Massingill, stating that he had referred the patient to Dr. Folse who then became primarily responsible for the treatment of the patient after his admission to the hospital. The court also found no liability on the part of Richland Parish Hospital, stating that all necessary forms, rules and regulations were set out and provided for the doctors practicing at the hospital.
The court stated that the issue in the case was whether the medical procedure was adequately explained to Mr. Yahn and whether he heard and understood the explanation. The court expressed concern over the lack of a signed consent form stating, "We will never know now exactly why the consent form was not signed as recorded in the [doctor's] notes." However, the court found that despite Mr. Yahn's hearing deficit, it was possible to communicate with him and that the procedure and the need for the arteriogram were explained to him. The court also found that Mr. Yahn verbally agreed to the procedure. The court stated, "Mr. Yahn did have a basic understanding of what was going on, but even if he did not, faced with a life threatening illness, he would not have refused the test." The court stated that Mr. Yahn's aneurysm was life threatening and no reasonable person under these circumstances would have refused the arteriogram to determine the cause of the fainting and to determine a course of treatment for the aneurysm. Based upon these findings, the trial court rejected the plaintiffs' claims. The plaintiffs appealed the trial court judgment.

*265 CONSENT

The plaintiffs contend that the trial court erred in finding that Mr. Yahn consented to the arteriogram. They further contend that even if Mr. Yahn gave his consent, it was not informed consent. This argument has merit.
The informed consent doctrine is based on the principle that every human being of adult years and sound mind has a right to determine what shall be done to his or her own body. Hondroulis v. Schuhmacher, 553 So.2d 398 (La.1988). In recognition of the right of self-determination, surgeons and other physicians are required to provide their patients with sufficient information to permit development of an informed and intelligent decision about whether to submit to a proposed course of treatment. Broadway v. St. Paul Insurance Company, 582 So.2d 1368 (La.App.2d Cir.1991).
LSA-R.S. 40:1299.40, governing consent to medical treatment, provides in pertinent part:
A. Notwithstanding any other law to the contrary, written consent to medical treatment means a consent in writing to any medical or surgical procedure or course of procedures which (a) sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures, (b) acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner, and (c) is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.
. . . .
C. Where consent to medical treatment from a patient, or from a person authorized by law to consent to medical treatment for such patient, is secured other than in accordance with Subsection A above, the explanation to the patient or to the person consenting for such patient shall include the matters set forth in Paragraph (a) of Subsection A above, and an opportunity shall be afforded for asking questions concerning the procedures to be performed which shall be answered in a satisfactory manner. Such consent shall be valid and effective and is subject to proof according to the rules of evidence in ordinary cases.
It is undisputed that written consent to treatment was not obtained from Mr. Yahn. Therefore, under LSA-R.S. 40:1299.40(A), there is no presumption of valid consent. However, consent to treatment need not be written; it may be verbal if necessary information is conveyed to the patient and the patient is given an opportunity to ask questions which are answered satisfactorily. Whiddon v. Elliott, 594 So.2d 449 (La.App. 1st Cir.1991); Mustacchio v. Parker, 535 So.2d 833 (La.App.2d Cir.1988). When a patient consents to treatment, but does not have sufficient information to make an informed decision concerning his treatment, the physician may be liable for a poor result. Mustacchio v. Parker, supra.
In a trial on the merits of a suit claiming inadequate disclosure of risk information by a physician, the patient has the burden of going forward with evidence tending to establish prima facie the essential elements of the cause of action, and ultimately the burden of persuasion on those elements. Hondroulis v. Schuhmacher, supra.
When circumstances permit, the patient should be advised of the character of his ailment, the general nature and risks of the proposed treatment or procedure, the prospects of success, the hazards of failing to undergo any treatment or procedure at all and the risks of alternative methods of treatment. Broadway v. St. Paul Insurance Company, supra; Hondroulis v. Schuhmacher, supra; Doss v. Hartford Fire Insurance Company, 448 So.2d 813 (La.App.2d Cir.1984), writ denied 450 So.2d 359 (La. *266 1984); Hidding v. Williams, 578 So.2d 1192 (La.App. 5th Cir.1991).
The doctor's duty is to disclose all risks that are "material." A risk is material if a reasonable person in the patient's position would likely attach significance to the risk or cluster of risks in deciding whether or not to forego the proposed treatment. Hondroulis v. Schuhmacher, supra. The determination of materiality of a risk is a two-step process and relies on an objective reasonable man standard in order to shield the physician from aberrational decisions on the part of patients. Broadway v. St. Paul Insurance Company, supra.
First, the existence and nature of the risk must be defined, together with a likelihood of its occurrence. Expert testimony is necessary to establish these factors because only a physician or some other qualified expert is capable of judging what risks exist and the likelihood of its occurrence. Hondroulis v. Schuhmacher, supra; Broadway v. St. Paul Insurance Company, supra; Hidding v. Williams, supra; Distefano v. Bell, 544 So.2d 567 (La.App. 1st Cir.1989), writ denied 550 So.2d 650 (La.1989).
Then the question of materiality becomes one for the trier of fact, who must then determine whether a reasonable person in the plaintiff's position would attach significance to the specific risk. Hidding v. Williams, supra; Broadway v. St. Paul Insurance Company, supra; Hondroulis v. Schuhmacher, supra.
Conclusions by the trier of fact should be affirmed by the appellate court unless the record reflects that the conclusions of fact are not supported by the evidence. Doss v. Hartford Fire Insurance Company, supra; Distefano v. Bell, supra. Reasonable evaluations of credibility and inferences of fact should not be disturbed on review, even though the appellate court may feel its own evaluations and inferences are as reasonable. Distefano v. Bell, supra.
The trial court found that Mr. Yahn's stroke was caused by the arteriogram. That finding has not been questioned on appeal. Also, the trial court judgment finding no liability on the part of Dr. Massingill and Richland Parish Hospital has not been questioned on appeal and is therefore final.
However, the record fails to support the conclusion by the trial court that Mr. Yahn was supplied with adequate information in a manner that he could hear and understand and that he, in fact, gave informed consent to the arteriogram.
It is not disputed that the occurrence of a stroke is a material risk of an arteriogram. It is also not contested that Dr. Folse mentioned in Mr. Yahn's presence the possibility that a stroke could occur during the procedure. It is also not disputed that when Dr. Folse attempted to tell Mr. Yahn that he needed to have the arteriogram, Mr. Yahn responded affirmatively. The dispute in this case is whether the necessary information was provided to Mr. Yahn in such a way that he could hear and understand what was being said and that he gave informed consent.
Mr. Yahn was an elderly man with very little education. He was functionally illiterate and was extremely hard of hearing. Witnesses testified that he was deaf in one ear and had only limited hearing in the other ear. Dr. Folse, who had never met Mr. Yahn, went to his room to obtain consent to the arteriogram. He stated that he knew instinctively that the patient was hard of hearing by watching his eyes. Dr. Folse stated that he sat close to Mr. Yahn and spoke to him in a loud voice.
Dr. Folse attempted to tell Mr. Yahn about the pertinent material risks of the procedure, such as hemorrhage at the puncture site, clots forming on the catheter, an embolus being knocked off the artery wall, or an allergic reaction to the dye used in the procedure. However, Dr. Folse did not talk about the possibility of a thrombus to the lower extremities, the possibility of a tear in the aneurysm or impairment of kidney function. Dr. Folse testified that he did tell Mr. Yahn about the possibility that the procedure could cause a stroke. This fact is corroborated by the testimony of Beverly Sanders who stated that, when she learned of the possibility that a stroke might be precipitated by the procedure, she became very upset and voiced clear opposition to the arteriogram.
*267 Even though Dr. Folse spoke to Mr. Yahn about the possibility that the arteriogram might result in a stroke, Dr. Folse's own testimony demonstrates that Mr. Yahn may not have heard or understood what was said. Dr. Folse testified that he did not engage Mr. Yahn in conversation or ask him to respond in any way in an attempt to ascertain whether he could hear and understand what was being said to him. At trial, Dr. Folse stated that after the explanation, he could not recall what Mr. Yahn said or what his exact response was, although Dr. Folse had the "impression" when he left the room that he had Mr. Yahn's consent to do the procedure. However, Dr. Folse also acknowledged that Mrs. Sanders was extremely upset over the possibility that the procedure might cause a stroke. Dr. Folse stated that he was so distracted by Mrs. Sanders' reaction that he forgot to get Mr. Yahn to sign a written consent form.
Mrs. Sanders testified that when Dr. Folse entered the room, she told him that her father was hard of hearing. Dr. Folse then turned away from Mr. Yahn and began addressing his comments to Mrs. Sanders. When she objected to the procedure, she claimed that Dr. Folse turned to her father and told him that he needed to have the arteriogram and he said, "Okay." She also stated when she told her father that he should not submit to the procedure he also responded, "Okay." There was testimony to the effect that Mr. Yahn had a habit of saying "okay," regardless of what was said to him.
Further, Mrs. Sanders testified that she spoke with Dr. Folse in the hallway outside the room and told him she did not want her father to have the procedure. She stated that Dr. Folse told her everything would be all right and then walked away. Two orderlies were waiting outside the room to take Mr. Yahn to the radiology department.
Mrs. Gloria Perot, a family friend who was in Mr. Yahn's room while Dr. Folse was explaining the procedure, testified that, even though she has a high school education, she did not understand what Dr. Folse was saying. Mrs. Perot also testified that Mrs. Sanders was very upset at the prospect of Mr. Yahn undergoing this procedure. However, according to Mrs. Perot, Mrs. Sanders said that she would leave the decision up to her father.
The record shows that in attempting to make the required explanation, Dr. Folse was faced with an elderly patient who was uneducated and extremely hard of hearing. Further, he was confronted with the patient's daughter, Mrs. Sanders, who became very emotional and voiced opposition to the procedure. In light of these factors, not only did Dr. Folse fail to obtain written consent, he was also unable to testify that he had a clear, unequivocal, oral informed consent to the procedure by the patient. All that Dr. Folse could point to at trial was his "impression" that he had Mr. Yahn's consent to the procedure when he left the patient's room. Further, there was no showing of any emergency in this case requiring that the arteriogram be performed immediately. Additional time could have been taken to ensure that Mr. Yahn heard and understood the risks associated with this procedure and gave informed consent. Under these circumstances, we find that the trial court was clearly wrong in finding that Mr. Yahn heard and understood the explanation given by Dr. Folse and that he gave his oral, informed consent to the procedure.

CAUSAL RELATIONSHIP
Even though there was no informed consent, the inquiry does not end. There must be a causal connection between the lack of informed consent and the treatment and damage. The plaintiffs argue that the trial court erred in finding that, under the circumstances of this case, a reasonable person would not have refused to undergo the procedure. This argument is meritless and requires that we affirm the trial court judgment.
If a material risk is not disclosed to the patient and consent is found to be deficient, in order to recover, there must also be a showing that a causal relationship exists between the doctor's failure to disclose the material information and the patient's damage. Broadway v. St. Paul Insurance *268 Company, supra; Hondroulis v. Schuhmacher, supra. The plaintiff has the burden of proving that if the risk had been disclosed, the treatment and the unwanted consequences would have been avoided. If the patient would have undergone the treatment in spite of the risk, then the failure to inform cannot be said to be the cause of the unwanted consequences and the plaintiff cannot recover. Mustacchio v. Parker, supra; Broadway v. St. Paul Insurance Company, supra; Hidding v. Williams, supra; Mike v. Maxwell, 577 So.2d 1090 (La.App. 1st Cir.1991). Factors to consider in determining causation are the condition of the patient at the time of the decision, the necessity for treatment, the seriousness of the undisclosed consequences, the likelihood of the consequences occurring and the measures available for the correction of the consequences, should they occur. Mustacchio v. Parker, supra; LaCaze v. Collier, 434 So.2d 1039 (La.1983); Roussel v. Sharp, 569 So.2d 67 (La.App. 4th Cir.1990).
In this case, Mr. Yahn had two different medical problems that had been identified by preliminary tests. First, the abdominal aneurysm posed a very serious threat to the patient's life. Although Mr. Yahn was not experiencing any pain or discomfort from this condition, Dr. Massingill testified that it did pose a significant threat. Medical testimony in the record indicates that, if left untreated, aneurysms of this type will eventually rupture, resulting in death.
Second, testing showed that Mr. Yahn had some plaque formation in one carotid artery and had ulceration of plaque in the other artery. Although this condition was thought to be a possible cause of Mr. Yahn's fainting spells, there was no showing that this condition was as serious or as potentially life threatening as the aneurysm.
The record shows that Mr. Yahn needed to have the aneurysm further evaluated before a surgical repair could be attempted. To evaluate only the aneurysm, a translumbar puncture procedure could have been utilized which would not have involved the carotid arteries and would not have carried the risk of dislodging plaque from those arteries.
The finding of plaque in the carotid arteries, although suspected as a possible cause of the fainting spells, did not seem to pose as great a threat to Mr. Yahn's life as the aneurysm. However, due to the finding of the plaque build up and ulcerated plaque in the arteries it was decided that the translumbar procedure would not be utilized, but rather the type of arteriogram actually performed, which involved entry through a vein in the leg. This procedure would allow for study of both the aneurysm and the carotid arteries in a single procedure.
All the medical experts agreed that the risk of stroke was a serious risk associated with arteriograms. Dr. Michael Futrell testified that there was a one percent risk of stroke from this procedure, but in patients over the age of 70, the risk factor was two to four times higher.
Dr. Robert Golson testified that this procedure carried a .5% chance of stroke, but that due to Mr. Yahn's advanced age, his risk factor was five to ten times greater.
Dr. James V. Jones, Jr. testified that arteriograms carry a one in one hundred chance of stroke, but that Mr. Yahn's risk factor was higher due to his age.
There was no testimony to show what measures could have been undertaken to correct the stroke once it had occurred.
Although Dr. Futrell testified that it would have been reasonable for someone Mr. Yahn's age to refuse to have an arteriogram, he also testified that 90% to 95% of patients agree to undergo an arteriogram after the risks have been explained. Dr. Golson testified that, after being informed of the procedure and the risks involved, patients rarely refuse to undergo the procedure.
Dr. Futrell stated that in patients who are 81 or 82 years old, when the risk of complications or death from a procedure is ten to twenty percent, about twenty-five percent of people choose not to undergo the procedure. According to expert medical testimony in this case, Mr. Yahn's risk of a stroke from this procedure was four to five percent at most.
We also note that Dr. Futrell testified that during the course of his practice, he has performed 5,000 to 6,000 heart catheterizations, a procedure similar to the arteriogram, *269 and has performed 500 to 1,000 carotid arteriograms. Only three of his patients have suffered mild strokes and none of his patients have died from the procedure.
Dr. Golson testified that he has performed 1,000 to 2,000 arteriograms with only one patient suffering a stroke and that occurred before the procedure began.
Mr. Yahn had an abdominal aortic aneurysm and, according to Dr. Futrell, almost all aortic aneurysms rupture if left untreated, usually resulting in death. Further, Mr. Yahn had ulceration of plaque in one carotid artery which may have been responsible for his fainting spells. This condition, if left untreated, also carried the risk of causing a stroke. The medical experts agreed that, in this case, the arteriogram was an appropriate test and all testified that there was nothing inappropriate in the manner in which the test was performed.
Under these circumstances, where Mr. Yahn was faced with one medical condition that would almost surely cause death if left untreated and another medical condition that carried a serious threat to his health, a reasonable person would have consented to the arteriogram to further evaluate both conditions and allow the treating physicians to formulate an appropriate course of treatment. The trial judge so found, and we are unprepared to say that his finding in this regard is clearly wrong.
Therefore, we find that, even though there was a lack of informed consent to the procedure, a reasonable person, under these circumstances, would not have refused to undergo the arteriogram.

CONCLUSION
For the reasons stated above, although we find that Mr. John Yahn failed to give his informed consent to the arteriogram, we agree with the trial court's finding that, even in the absence of informed consent, a reasonable person under these circumstances would not have refused to undergo the procedure. Accordingly, the plaintiffs claim for damages is denied and the judgment of the trial court is affirmed. Costs in this court and the court below are assessed to the plaintiffs.
AFFIRMED.
BROWN, J., dissents with written reasons.
BROWN, Judge, dissenting.
As recognized in the majority opinion, every human being of adult years and sound mind has a right to determine what shall be done to his or her own body. Under the circumstances of this case, the majority correctly determined that there was no informed consent by the patient to the procedure which resulted in a stroke.
The majority opinion correctly states that "Dr. Folse was faced with an elderly patient [82 years old] who was uneducated and extremely hard of hearing. Further, he was confronted with the patient's daughter, Mrs. Sanders, who became very emotional and voiced opposition to the procedure." (emphasis added). After finding no informed consent, the majority passed on the issue of the daughter's opposition to the procedure. There was no emergency. Dr. Folse was not communicating with the patient and the adult daughter objected to the procedure. Rather than proceeding, Dr. Folse should have sought a family meeting. In this case, positive opposition existed to a procedure that carried a significant risk to a man of this patient's age. Mr. Yahn had never seen a doctor and except for the brief fainting episodes was in good health. He did not die of a rupture of the aortic aneurysm but from a stroke caused by the invasive procedure. For one year after the stroke Mr. Yahn's quality of life was destroyed by a test to which he did not consent and to which his daughter was opposed.
To simply say that if the patient understood he would have consented renders impotent the constitutional principle that we each have the right to determine what shall be done with our bodies.
I respectfully dissent.

ON REHEARING
VICTORY, Judge.
In its original opinion, the majority affirmed the trial court's dismissal of plaintiffs' *270 claims, holding that although the trial court was in error in holding that Mr. Yahn gave informed consent to the arteriogram, a reasonable person in Yahn's condition would not have refused the test. On rehearing, we conclude that the record supports the trial court's ruling that Mr. Yahn gave his informed consent to the procedure, and again affirm the trial court judgment.

FACTS
The circumstances surrounding this case are fully set forth in the original opinion. However, briefly restated, the facts are as follows.
In February, 1988, Mr. John L. Yahn, an 82-year-old gentleman, was experiencing episodes of dizziness and fainting. His family physician in Newellton, Louisiana, Dr. Chapman, referred him to Dr. Robert Massingill in Rayville, Louisiana. After full consultation with Dr. Massingill, Yahn was hospitalized for specialized testing, which revealed that he had an abdominal aortic aneurysm. It was also determined that he had some plaque formation in the right carotid artery and ulceration of plaque in the left carotid artery.
The physician caring for Yahn, Dr. Massingill, determined that an arteriogram was necessary to study the aneurysm and the carotid arteries. Dr. Massingill advised Yahn that additional testing should be done. The defendant, Dr. Craig P. Folse, a radiologist, was to perform the arteriogram.
On the day the test was to be performed, Dr. Folse went to Yahn's hospital room to explain the test and to obtain his consent. While in Yahn's room, Dr. Folse explained to Yahn, who was illiterate and hard of hearing, the procedure and attendant risks.

CONSENT
In a written opinion, the trial judge held that Yahn gave informed consent. Since the record supports this trial court ruling, it is not manifestly erroneous. Thus, the trial court judgment is again affirmed on rehearing, but for different reasons than those expressed in the original majority opinion.
Although he was 82 years old and illiterate, the record shows and the trial court held that Yahn was mentally alert and was able to communicate with persons in the room before Dr. Folse entered to discuss the proposed arteriogram with him. The trial court based this determination on the testimonies of Dr. Massingill (who testified Yahn had no difficulty understanding him), Dr. Folse, Mrs. Perot, and the "testimony of almost all who testified."
Yahn was hard of hearing, a fact explained to Dr. Folse as he entered the room, resulting in the doctor sitting close to Yahn and explaining the known material risks of the procedure in a loud voice. The record shows Dr. Folse spent between 15 and 30 minutes with Yahn, affording him the time and opportunity to ask questions about the procedure if he had wanted to do so. The trial court found that Dr. Folse explained the procedure "in as much detail as other doctors use." As the doctor was explaining the risks to Yahn, Yahn's daughter verbally objected to the arteriogram, claiming that she was familiar with the procedure and well aware of the risks. Dr. Folse then explained to Yahn that he really needed to have the procedure done and Yahn nodded his head and said, "okay."
Although she denied it at trial, the trial court found that Yahn's daughter told witnesses in the room that she would leave the decision for the arteriogram to her father, clearly indicating her belief that her father had been informed of the procedure and its material risks, had actually heard what had been said by Dr. Folse in spite of his hearing problem, had understood what he had heard, and had given informed consent.
Thereafter, Yahn allowed himself to be taken to the radiology department of the hospital where the procedure was to be performed. He never indicated that he was unaware that the arteriogram was to be conducted or objected to the procedure.
Further, Yahn's daughter accompanied her father to the area of the hospital where the procedure was to be performed. She remained in the waiting area outside the radiology department while the arteriogram was performed. There is no showing that Yahn *271 opposed the procedure or that his daughter indicated in any way that he opposed the procedure before or after Yahn was taken from his room.

CONCLUSION
Because Dr. Folse failed to obtain Yahn's written consent,[1] he had the burden of proving Yahn's informed consent to the arteriogram. The trial court finding that Dr. Folse carried the burden of proof is not clearly wrong, but is supported by the record as we have indicated above. Therefore, the judgment of the trial court is affirmed.
AFFIRMED.
LINDSAY, J., concurs in the result and assigns reasons.
NORRIS and BROWN, JJ., dissent and assigns reasons.
LINDSAY, Judge, concurring.
I concur in the opinion on rehearing insofar as it affirms the trial court judgment. However, I disagree with the opinion on rehearing which holds that Mr. Yahn gave informed consent to the arteriogram.
For the reasons outlined by the majority in the rehearing opinion, and as outlined in the original opinion, the trial court correctly determined that Mr. Yahn gave actual consent to the arteriogram. Because Mr. Yahn gave his actual consent, the facts of the present case are distinguishable from those in Pizzalotto v. Wilson, 437 So.2d 859 (La.1983), in which there was no consent, actual or informed, to a surgical procedure. Therefore, Pizzalotto is not applicable to the present case.
Contrary to the statements made by the dissenting judges, there are numerous factors which support the trial court's ruling and this court's ruling on original hearing and on rehearing, that Mr. Yahn gave his actual consent to the conduct of the arteriogram. Mr. Yahn knew that he was not well. He was experiencing dizziness and fainting spells. Mr. Yahn consulted his family physician concerning his symptoms and was ultimately referred to another physician and hospitalized for testing. It was determined that he had an aortic aneurysm, some plaque formation in the right carotid artery and ulceration of plaque in the left carotid artery. It was also determined that additional testing, consisting of the arteriogram, was necessary to study the aneurysm and the carotid artery. The arteriogram was to be conducted by the defendant, Dr. Folse. The record reveals that Mr. Yahn was aware of his condition and was advised, and agreed, that the additional testing should be done.
On the day the test was to be performed, Dr. Folse went to Mr. Yahn's hospital room. The doctor talked to Mr. Yahn about the arteriogram and Mr. Yahn indicated that he was agreeable to the procedure. He allowed himself to be taken to the radiology department of the hospital where the arteriogram was to be performed. He never indicated that he was unaware that the procedure was to be conducted. His daughter, Mrs. Sanders, who had earlier voiced opposition, accompanied her father to the hospital's radiology department. She remained in the waiting room while her father was undergoing the arteriogram. The record shows that Mr. Yahn knew that Dr. Folse intended to perform the arteriogram and that Mr. Yahn assented to the procedure. Mr. Yahn never opposed the procedure, nor did Mrs. Sanders persist in her opposition after her father was taken from his room. Based upon these facts, it is clear that Mr. Yahn did give his actual consent to the arteriogram and the trial court was correct in its conclusion on this issue.
However, as stated in the original opinion, and after considering this matter on rehearing, I am not persuaded that Mr. Yahn gave his informed consent to the arteriogram. Due to Mr. Yahn's difficulties in hearing and his limited education, he did not adequately understand the risks involved in the procedure, and therefore, did not give his informed consent. The record does not affirmatively show that Dr. Folse gave an explanation *272 of the risks involved in the procedure, sufficient for Mr. Yahn to adequately understand what might result. Although Dr. Folse may have given some explanation of the risks, he was aware of Mr. Yahn's hearing difficulties, yet he failed to carry his burden of proving that Mr. Yahn was sufficiently aware of the risks involved. There was no emergency involved in this case, requiring that the procedure be performed immediately. Therefore, additional time could have been taken to determine that Mr. Yahn heard and understood the risks associated with the arteriogram in order that he might proceed with full knowledge of those risks. Under these circumstances, I conclude that although Mr. Yahn gave his actual consent to the procedure, he did not give his informed consent.
Because there was no informed consent, Hondroulis v. Schuhmacher, 553 So.2d 398 (La.1988), applies to this case. Hondroulis, supra, discussed the ramifications of a patient's failure to give informed consent to a procedure with full knowledge and understanding of the material risks involved. That case stated there must be a causal relationship between a doctor's failure to disclose material information and the material risk of damage to the patient. Because of the likelihood of a patient's bias in testifying in hindsight on this hypothetical matter, the court in Hondroulis, supra, adopted the objective standard of causation: "Whether a reasonable patient in the plaintiff's position would have consented to the treatment or procedure had the material information and risks been disclosed."
Applying the objective standard of causation, as discussed in Hondroulis, supra, a reasonable patient in Mr. Yahn's position would have consented to the treatment or procedure, had the material information and risks been disclosed. Mr. Yahn was faced with an aneurysm, which was a serious, life-threatening condition. He also had plaque in his arteries and ulceration of that plaque which may have been responsible for the dizziness and fainting episodes for which he originally sought medical treatment.
Further, the record shows that even though stroke is a material risk of an arteriogram, the risk was comparatively low, even for a person of Mr. Yahn's advanced age. Medical experts who testified at trial stated that, for a person of Mr. Yahn's age, the risk of stroke in this procedure is two to five percent. The medical experts also testified that, in their actual practice, the incidence of stroke from this procedure is very low and in most instances, when the material risks are explained to a patient, the patient will give informed consent and undergo the procedure.
Therefore, when applying the objective standard of causation, as set forth in Hondroulis, supra, I find that a reasonable patient in Mr. Yahn's position would have consented to the treatment or procedure, had the material information and risks been disclosed to him. For these reasons, I concur in the affirmance of the trial court judgment.
NORRIS, Judge, dissenting.
The trial court had considerable difficulty with the quality of the evidence offered to prove consent, finally finding solace in the application of the rule, erroneously I think in this instance, that if Mr. Yahn did not have a "basic understanding of what was going on" he still would not have refused the test.
In this court's original opinion the plurality, after an exhaustive review of the evidence, concluded:
Under these circumstances we find that the trial court was clearly wrong in finding that Mr. Yahn heard or understood the explanation given by Dr. Folse and that he gave his oral, informed consent to the procedure. (emphasis mine)
Nonetheless, the opinion finally concluded, without being able to articulate what Yahn heard and understood as opposed to what he did not hear or understand, that this case fell under the "informed consent doctrine" and that although Yahn did not give his "informed consent" he would not have refused the procedure had he heard and understood. On rehearing, the plurality correctly views the issue as whether Yahn heard and understood the doctor's explanation and consented, rather than whether the doctor failed to explain a material risk or risks. The plurality then seeks to cure the trial court's uncertainty, *273 as well as this court's earlier finding that Yahn did not hear or understand the explanation, with an excessive dose of the clearly wrong standard. Judge Brown dissented from the original opinion believing that Yahn did not consent at all and maintains that status now; the author of this court's original opinion in a concurrence moves as close as possible to the new plurality opinion without "getting in the boat." The concurring opinion now apparently retreats from what I believe to be the well-reasoned and documented position that Yahn did not hear or understand Dr. Folse's explanation in favor of a new position that the "record does not affirmatively show that Dr. Folse gave an explanation of the risks involved in the procedure, sufficient for Mr. Yahn to adequately understand what might result." However, the concurring opinion still does not articulate with any specificity what Yahn was told, heard and understood as opposed to what he was not told, did not hear or understand.
Dr. Folse for some reason failed to obtain written consent although his records erroneously state that he did; therefore, consent is not presumed and must be proved by the doctor as in the ordinary case. La.R.S. 40:1299.40(C). Dr. Folse admittedly asked Yahn no questions and he made no reasonable attempt to ascertain if this 82-year-old, hard-of-hearing patient heard or understood the explanation of the procedure. As I read the record, Dr. Folse did not give Yahn an opportunity to ask questions about the procedure as required by La.R.S. 40:1299.40(C). Had he done so, he might have been in a better position to know whether or not Yahn had in fact heard and understood the explanation given him. However, at trial, Dr. Folse could only testify that he had an "impression" that Yahn consented. I am unwilling to infer that Yahn consented to the specific diagnostic procedure at issue simply because he allowed the nurse and orderly to transport him to the testing site without objection. The contention that the record shows Mr. Yahn knew Dr. Folse intended to perform the arteriogram and that he consented to the procedure is speculation.
Dr. Folse failed to carry his burden of proving valid oral consent to the procedure based on this record. The original opinion of this court correctly recognized this but erroneously applied the "informed consent doctrine." Accordingly, the test conducted on Mr. Yahn amounted to a non-consensual touching or battery and Pizzalotto v. Wilson, 437 So.2d 859 (La.1983), applies.
BROWN, Judge, dissenting.
This is not a case of a medical procedure negligently performed. Rather, it involves a patient's right to exercise complete control over his/her medical destiny.
Volenti non fit injuria ("to one consenting there is no legal injury"). LSA-R.S. 40:1299.40 sets forth the guidelines for obtaining a patient's consent to surgery. Although Dr. Folse entered the patient's room with a standard form, no written consent was obtained. Therefore, a valid consent is not presumed and requires proof in accordance with ordinary evidentiary rules. The fact of consent and its extent are normally matters governed by contract and the law of contracts. It fell upon Dr. Folse to demonstrate by a preponderance of the evidence that the patient consented to the arteriogram. LSA-R.S. 40:1299.40(C).
The medical review panel had questions concerning consent and deferred that issue to the judiciary. As evidenced in its opinion, the trial court was also clearly troubled by the evidence presented concerning consent. Although finding consent, the trial court stated that even if Mr. Yahn did not consent, he would not have refused the test. The trial court further stated for the record "that absent these exact and very similar circumstances the conclusion reached by this court would have been different."
In its original opinion this court concluded that the trial court was "clearly wrong in finding that Mr. Yahn heard and understood the explanation given by Dr. Folse[.]" This court said further:
Dr. Folse's own testimony demonstrates that Mr. Yahn may not have heard or understood what was said. Dr. Folse testified that he did not engage Mr. Yahn in conversation or ask him to respond in any way in an attempt to ascertain whether he *274 could hear and understand what was being said to him. Maj.Op. p. 266.
* * * * * *
... In light of these factors, not only did Dr. Folse fail to obtain written consent, but he was also unable to testify that he had a clear, unequivocal, oral, informed consent to the procedure by the patient. All that Dr. Folse could point to at trial was his "impression" that he had Mr. Yahn's consent to the procedure when he left the patient's room. Maj.Op. p. 267.
* * * * * *
Under these circumstances we find that the trial court was clearly wrong in finding that Mr. Yahn heard and understood the explanation given by Dr. Folse and that he gave his oral, informed consent to the procedure. Maj.Op. p. 267.
On rehearing the author of the original opinion in a concurrence attempts to clarify the consent issue by finding that Mr. Yahn actually consented because he "okayed" the procedure. This patient's participation in the decision-making process was limited to one word, "OK." It is not possible, however, to say that this patient understood enough to agree to the procedure, nor is it possible to conclude what, if any, parts of the doctor's explanation were heard and understood.
Additional factors set forth in the concurrence, to shore-up the conclusion that actual consent was given, are not supported by the record. Dr. Massingill testified that Mr. Yahn's family sought a medical evaluation for "brief and far-spaced" dizziness and fainting spells. Dr. Massingill considered the arteriogram elective surgery and believed that Mr. Yahn had the capacity to understand and consent. Dr. Massingill, however, did not obtain consent or explain the risks associated with this invasive procedure.
It was Dr. Folse's obligation to explain the procedure and obtain Mr. Yahn's consent in the manner required by LSA-R.S. 40:1299.40(C). Dr. Folse had to satisfy himself that the patient understood enough to validly consent to the procedure. Dr. Folse had never met Mr. Yahn. Upon entering the hospital room, Dr. Folse immediately realized that Mr. Yahn had great difficulty hearing and knew that because of the patient's age the arteriogram presented greater and more serious risks.
Although Dr. Folse testified that he knew of the patient's obvious diminished hearing, he made no attempt to ascertain whether Mr. Yahn understood what he was being told. Dr. Folse became flustered when the patient's daughter interrupted and objected to the procedure. When asked how he determined that the patient consented to the arteriogram, Dr. Folse stated:
Yes sir, I can't recall what Mr. Yahn said or what his exact response is, but it was my impression when I left the room that I had his consent. (Emphasis added).
The patient's daughter testified that her father did not consent to the procedure and that she objected. The witness in the hospital room testified that the patient's only response to Dr. Folse was "OK" but that this was his typical response. She testified that Dr. Folse made no effort to determine if the patient understood any of his remarks; in fact, the witness who heard Dr. Folse's explanation did not understand.
There was no emergency. No written consent was obtained. Dr. Folse did not engage this 82-year-old patient in a two-way conversation, nor did he allow an opportunity for Mr. Yahn to ask questions as required by LRS-R.S. 40:1299.40(C). To be valid, actual consent requires an understanding as set forth in LSA-R.S. 40:1299.40(C). Under these circumstances, it cannot intelligently be said that Dr. Folse carried his burden of proof. Thus, a battery or nonconsensual touching occurred as proscribed by Pizzalotto v. Wilson, 437 So.2d 859 (La.1983).
I respectfully dissent.
NOTES
[1] Because he was illiterate, Yahn would not have been able to read the written consent form even if his signature had been obtained.